[Cite as *State v. Wright*, 2022-Ohio-2161.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO | : | APPEAL NO. C-210486 |
| | | TRIAL NO.   B-2100423 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| GREGORY WRIGHT, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  June 24, 2022



*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Paula E. Adams,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Derek W. Gustafson,* for Defendant-Appellant.

**CROUSE, Judge.**

**{¶1}** Defendant-appellant Gregory Wright has appealed from the trial court's judgment denying his motion to suppress a firearm and statements he made to police after his arrest. For the reasons discussed below, we overrule the sole assignment of error and affirm the trial court's judgment.

## Facts

**{¶2}** The relevant facts come from a hearing held by the trial court on Wright's motion to suppress. Sharonville Police Officer Zachary Jones testified, and the parties submitted footage from Jones's body camera.

**{¶3}** Jones testified that he was called to the Baymont Inn in Hamilton County, Ohio, twice on the night of January 21, 2021. Jones first responded at 1:17 a.m. to a complaint about noise and a fight on the fourth floor. The first body camera clip showed that Jones and three other officers went up to the fourth floor, where they heard loud noises coming from room 408. Jones knocked on the door and eventually a man answered. The room was noisy and full of people. Jones asked the man who had rented the room. The man said he would get the person and come right back.

**{¶4}** When the door reopened, many of the individuals, including Wright and Olivia Harris, the woman he was later stopped with, left the room and walked down the hall. Wright spoke to Jones, apparently attempting to put him at ease by telling him that they respected him and the other officers and were leaving. Jones clarified to the men who remained in the hotel room that he had not ordered everyone to leave and that he was simply investigating a complaint about noise and a fight. At that point, many of the people, including Wright and Harris, returned to the room. On his way

back into the room, Wright spoke with Jones again, this time joking with Jones. The officers reminded the occupants to keep the noise down and they left the hotel.

{¶5} Later, at approximately 3:40 a.m., Jones, accompanied by Sharonville Police Officer Siefring, responded to another call at the Baymont Inn about a fight in progress on the fourth floor. Jones did not know who the complainant was, and the complainant did not describe the perpetrators.

{¶6} Jones testified that as he and Siefring were standing in the hotel lobby outside the elevator, he could hear "profanity and shouting; a disturbance coming from inside the elevator as it came down to the first floor." He testified that he heard a "higher pitched" voice in the elevator, but could not discern what was being said. He also heard "banging" coming from the elevator. He testified, "It sounded like an altercation in the elevator."

{¶7} The elevator doors opened and Wright and Harris were inside. Jones testified that they were standing very close together, and that Harris was "almost backed into a corner" of the elevator. He testified that Harris's hair weave had been mostly ripped off, she had an eyelash missing, and she was out of breath and appeared disheveled. Jones testified that although he was unsure, he believed he recognized Wright as one of the occupants of room 408 with whom he had interacted earlier. Jones was concerned that a physical altercation had occurred in the elevator, so he stopped Wright and Harris and told them they could not leave until they "sorted it out."

{¶8} The second body camera clip captured the events that led to Wright's arrest. As Jones and Siefring entered the hotel lobby, yelling can be heard on the video. Jones and Siefring looked for the stairwell to no avail and returned to the lobby. More

3

yelling can be heard as the elevator descended to the first floor. As the elevator doors opened, Harris said, "I'm so mad." Harris was standing in the back of the elevator and Wright was standing close to her and between her and the elevator doors. Wright and Harris walked out of the elevator and into the lobby, and Jones immediately blocked Wright and Harris from leaving the lobby. He told them, "Hold tight, hold tight, don't leave, you're not leaving." Wright and Harris both said they were trying to leave. Jones said, "I know, but we can hear screaming, pounding." Harris said, "We're not, that's them [pointing upstairs]. We didn't do it, we're here together, we're not even here with them." Harris's hair was clearly disheveled.

{¶9} Wright said, "We ain't got nothing to do with it." Jones said, "No, you're gonna wait, we're gonna figure it out. We'll probably just get you out of the hotel." Siefring asked Wright, "Are they still fighting up on the fourth floor?" Wright responded, "Yeah, they up there fighting," and started to walk away. Jones told Wright, "You're not leaving yet man." Siefring reached for Wright's arm, and Wright ran down the hallway. Siefring caught up with him outside the exit doors and tackled him to the ground. Jones followed and aided Siefring in detaining Wright. Jones's body camera was knocked off his body and became obscured during the struggle, but the camera recorded audio of Siefring telling Wright, "Quit reaching, quit reaching." Siefring said, "He's got a gun." Jones yelled, "Gun, gun, gun." Jones testified that the handgun had been "kicked" out of Wright's hands during the struggle. Wright denied owning the handgun.

{¶10} Wright filed a motion to suppress the handgun and statements he made to officers after he was arrested. The trial court denied the motion to suppress. Wright

4

was indicted for carrying a concealed weapon and having a weapon while under a disability. He pled no contest as charged, was sentenced, and filed the instant appeal.

## The Investigative Stop

**{¶11}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* The appellate court then independently determines, without deference to the trial court's conclusion, whether the facts satisfy the legal standard. *Id.* at ¶ 9.

**{¶12}** The Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio Constitution prohibit unreasonable searches and seizures. *State v. Ward*, 2017-Ohio-8141, 98 N.E.3d 1257, ¶ 13 (1st Dist.). Warrantless searches are per se unreasonable unless an exception applies. *Id.* The state bears the burden of establishing the validity of a warrantless search. *Id.*

**{¶13}** "There are three general categories of police-citizen contact for purposes of determining the protections afforded by the Fourth Amendment. These categories include (1) a consensual encounter, (2) an investigative detention or '*Terry* stop,' and (3) an arrest." *State v. Henson*, 1st Dist. Hamilton No. C-210244, 2022-Ohio-1571, ¶ 10.

**{¶14}** In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that a police officer may perform a brief investigative stop of a person when the officer has reasonable, articulable suspicion

that the person has been, is, or is about to be engaged in criminal activity. *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 19. The purpose of a *Terry* stop is to maintain the status quo momentarily while the officer determines the individual's identity or obtains more information. *State v. Bobo*, 37 Ohio St.3d 177, 180, 524 N.E.2d 489 (1988), citing *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

{¶15} "Precisely defining 'reasonable suspicion' is not possible, and as such, the reasonable-suspicion standard is 'not readily, or even usefully, reduced to a neat set of legal rules.' " *Hawkins* at ¶ 20, quoting *Ornelas v. United States*, 517 U.S. 690, 695-696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Reasonable suspicion is a less demanding standard than probable cause, and "considerably less" than proof of wrongdoing by a preponderance of the evidence, but it demands more than an "inchoate and unparticularized suspicion or 'hunch.' " *Hawkins* at ¶ 20, quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), quoting *Terry* at 27. The totality of the circumstances must be considered through the "eyes of the reasonable and prudent police officer who must react to events as they unfold." *Hawkins* at ¶ 21, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶16} The officers must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Hawkins* at ¶ 19, quoting *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). But officers "need not rule out the possibility of innocent conduct." *Hawkins*

at ¶ 22, quoting *United States v. Arvizu,* 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

{¶17} Wright argues that Jones did not have reasonable, articulable suspicion to stop him and Harris because Jones had not observed, and had not received a report alleging, criminal conduct by Wright. He cites *In re J.C.*, 1st Dist. Hamilton Nos. C-180478 and C-180479, 2019-Ohio-4815, and *In re M.P.*, 1st Dist. Hamilton Nos. C-130663 and C-130741, 2014-Ohio-2846, for the proposition that a police officer does not have reasonable, articulable suspicion to stop an individual where he does not observe and is not informed by others of criminal conduct by the individual. Neither case stands for that proposition. In both cases, this court held that the evidence presented by the state did not did not give rise to reasonable, articulable suspicion that the defendants were engaged in criminal conduct. *In re J.C.* at ¶ 25; *In re M.P.* at ¶ 14.

{¶18} Furthermore, adopting Wright's position would conflict with the purpose of a *Terry* stop, which is to allow a police officer who observes suspicious behavior to stop the individual and maintain the status quo while he obtains more information. *See Bobo,* 37 Ohio St.3d at 180, 524 N.E.2d 489. An officer is not required to wait until an offender commits a crime before investigating, or "shrug his shoulders" and allow a criminal to escape simply because he does not yet have probable cause to believe that the individual committed the crime. *Id.*

{¶19} Jones and Siefring were called to the hotel to break up a fight and investigate any corresponding criminal conduct. Once in the hotel lobby, they heard yelling and "banging" coming from the elevator as it descended. Jones testified that it "sounded like an altercation" was occurring in the elevator. When the elevator doors opened, Harris was in the back of the elevator and Wright was standing close to her

and between her and the doors. Jones believed that he recognized Wright from his earlier visit to the hotel. Harris was clearly disheveled and upset and said, "I'm so mad." Based on the totality of the circumstances, it was reasonable for the officers to prevent Wright and Harris from leaving the hotel until they could investigate further.

**{¶20}** Next, Wright argues that the officers' words and conduct in the hotel lobby constituted more than an investigative stop and amounted to an arrest that lacked probable cause.

**{¶21}** "An arrest occurs when the following four requisite elements are involved: (1) An intent to arrest, (2) under a real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." *State v. Carroll*, 162 Ohio App.3d 672, 2005-Ohio-4048, 834 N.E.2d 843, ¶ 8 (1st Dist.), quoting *State v. Darrah*, 64 Ohio St.2d 22, 26, 412 N.E.2d 1328 (1980). In *Carroll,* this court held that the defendant was not under arrest when he was stopped by police, or even when he fled. *Carroll* at ¶ 9.

**{¶22}** In *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, ¶ 20, the court rejected the defendant's argument that because the officers approached him with their guns drawn, they made an arrest and not an investigative stop. The officers had quickly responded to a report of gunshots in the area and therefore were justified in having their weapons drawn. *Id.* at ¶ 22. "The mere use or display of force in making a stop will not necessarily convert a stop into an arrest." *Id.* at ¶ 21, quoting *United States v. Hardnett,* 804 F.2d 353, 357 (6th Cir.1986). "Whether an investigative stop is converted into an arrest depends on, first, whether the officers had reasonable suspicion to make the stop, and second, whether the degree of

intrusion into the suspect's personal security was reasonably related to the officers' suspicions and the surrounding circumstances." *Hairston* at ¶ 21.

**{¶23}** Jones and Siefring had reasonable, articulable suspicion to make the initial stop. They attempted to gather more information, but Wright quickly fled. The officers did not use or display force or "intrude" on Wright's "personal security" until he fled. The officers' words and actions in the hotel lobby evince an investigative stop, not an arrest.

### Wright's Statements

**{¶24}** In addition to suppression of the firearm, Wright also moved the trial court to suppress any statements he made after he ran from the officers and was arrested.

**{¶25}** After Siefring tackled Wright and discovered the firearm, he asked Wright, "You got anything else on you?" Jones asked, "Where's the gun at?" Wright said, "I don't know what gun you're talking about." Siefring asked Jones, "Is that his gun?" Jones responded, "That's his gun." Wright said, "That's not my gun." Shortly thereafter, a police officer read Wright his *Miranda* rights.

**{¶26}** Wright argues his statements denying ownership of the firearm should have been suppressed because they were made in response to a question by the officers, after he was physically detained, and before he was advised of his right to remain silent. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**{¶27}** The trial court found that the statements were voluntary and not prejudicial. The body camera video supports the trial court's finding. The officers were attempting to secure the scene, specifically the firearm. Wright's statements were

voluntary and not the result of police interrogation. Furthermore, the statements were not inculpatory and were not prejudicial to Wright.

**{¶28}** Wright further argues that his statements should be suppressed as fruit of the poisonous tree because the investigative stop in the hotel lobby was improper. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). As discussed above, the investigative stop and subsequent detention of Wright were both proper. Therefore, the fruit-of-the-poisonous-tree doctrine is inapplicable.

## Conclusion

**{¶29}** Wright's sole assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

**ZAYAS, P.J.,** and **BOCK, J.,** concur.

Please note:
    The court has recorded its own entry on the date of the release of this opinion.