[Cite as *In re J.G.*, 2023-Ohio-4042.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: J.G. | : | APPEAL NOS. C-220637 |
| | | C-220638 |
| | : | C-220639 |
| | | TRIAL NOS. 22-710X |
| | : | 22-709X |
| | | 22-708X |
| | : | |
| | : | *O P I N I O N.* |

Appeals From: Hamilton County Juvenile Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: November 8, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Appellant State of Ohio,

*Raymond T. Faller,* Hamilton County Public Defender, *Jessica Moss*, Assistant Public Defender, and *Elizabeth Marcelli*, for Appellee J.G.

**CROUSE, Presiding Judge.**

{¶1}     Appellant the state of Ohio appeals from the trial court's entries granting appellee J.G.'s motion to suppress. The trial court suppressed all of J.G.'s statements made during an interview with Cincinnati police officers, as well as any evidence relating to his DNA, after determining that J.G.'s waiver of his *Miranda* rights was not voluntary, that his confession was both involuntary and coerced, and that J.G. did not voluntarily consent to DNA testing. Although J.G. raised no challenge in his suppression motion as to whether police officers had probable cause to stop him, the trial court nonetheless considered this issue sua sponte and additionally determined that while the officers had probable cause to stop J.G. and speak to him about the crime, they "did not have sufficient 'reasonable articulable suspicion' to conduct a Terry Stop" against him.

{¶2}     In two assignments of error, the state argues that the trial court erred in suppressing J.G.'s statements and DNA draw and that the trial court erred by granting the motion to suppress on grounds not raised by J.G. or addressed by the parties. Following our review of the record, we hold that the trial court did not err in determining that J.G.'s *Miranda* waiver was not voluntary under the totality of the circumstances and that J.G. did not voluntarily consent to the DNA draw. We need not reach the merits of the state's second assignment of error, as it is rendered moot by our resolution of the first.

## I. Factual and Procedural Background

{¶3}     On March 8, 2022, Cincinnati police officers investigated a burglary that occurred at 4727 Green Glen Lane. A rear door to the home was broken, multiple windows were smashed out, and blood droplets were found in the home.

{¶4}   As the officers were investigating and sectioning off the perimeter of the home, a group of four individuals, including J.G., walked past along the sidewalk. Noticing visible blood on J.G.'s jeans and hands, Officer Thomas Mendenhall stopped him for questioning. During the questioning, which occurred on the sidewalk approximately two houses away from J.G.'s own home, Officer Mendenhall noticed a large cut on J.G.'s wrist. J.G. stated that he cut his wrist after falling down the stairs at his home earlier that day. J.G. later stated that he injured his wrist when he tripped on the way home from school, clarifying that it was a separate injury to his pinky finger that he had referred to in his previous statement about falling down the stairs. When officers asked J.G. his name, he gave them a fake name.

{¶5}   Approximately three minutes after he was first stopped, J.G. was directed by one of the investigating officers to sit on the hood of a nearby police cruiser. Four minutes later, Officer Mendenhall told J.G. that he was not under arrest, but that he was going to be taken back to the police station for questioning. J.G. asked if he could give his belongings to his friends, who had remained nearby on the sidewalk. After being told no, J.G. responded, "I'm not doing that." J.G. was asked to get down off the hood of the car. When he did not immediately comply, the interaction between J.G. and the officers quickly turned from relatively cordial to combative and confrontational. An officer approached J.G. and put his hand on J.G.'s arms to move him off of the cruiser. J.G. immediately told the officer not to touch him and attempted to shake off the officer's arm. Four officers then restrained J.G. against the police cruiser to handcuff him. The decision to handcuff J.G. occurred approximately seven minutes into his detainment and four minutes after he was directed to sit on the hood of the cruiser. One officer held, but did not activate, a taser against J.G.'s back. J.G.

3

was visibly agitated and emotional, asking the officers to take the taser off his back, shouting, "F*** I'm not resisting," and exclaiming that the handcuffs were hurting his previously injured wrist. Body-camera video of the stop showed J.G.'s wrist bleeding underneath the handcuffs. J.G. was searched, put into the back of a police cruiser, and driven to a nearby police station for questioning.

{¶6}    Once at the station, J.G. was placed in a small interrogation room and made to sit in a chair in front of a table. He immediately requested to have the handcuffs removed, and he became very angry when officers refused to remove them.[1] He shouted at an officer and kicked a chair on the opposite side of the table partially across the room. Approximately four minutes passed before Detective Alex Gettys came in the room and asked to photograph J.G.'s injuries. J.G. was visibly in pain and bleeding from his wrist, and he refused to stand when asked. Officer Mendenhall came in to assist. He asked J.G. if he would like to stand up. J.G. said, "[N]o," and Officer Mendenhall responded, "You're going to be standing up." He told J.G. that it would be a lot easier if he just stood up. J.G. then told Officer Mendenhall not to touch him. Officer Mendenhall responded, "I'm going to have to touch you," and he pulled J.G. up out of the chair and pushed him against the wall as J.G. struggled to break free. Four other officers eventually entered the room as J.G. continued to struggle, resulting in J.G. kicking the chair he had been sitting in and knocking it over.

{¶7}    Three officers restrained J.G. against the wall. They forcibly turned his body to face the wall so that the photographer could take a picture of his injured, handcuffed wrist, and J.G. was lifted partially off the ground in the process. Two

---

[1] Both the state and J.G. submitted into evidence a video of J.G.'s interrogation and time in the interrogation room.

officers pressed the front of J.G.'s body against the wall, and another officer restrained J.G. by holding him against the wall by his neck. J.G. repeatedly told the officer to get off his neck. Cincinnati Police Officer Alexander McCoy[2] attempted to reason with J.G., stating, "The only thing we can do is react to what you are doing," and advising, "[C]onduct yourself like an adult, and we're gonna treat you like an adult." He told J.G. that "the minute you act up, it's gonna be very bad." J.G. finally calmed down and the officers made him sit back in the chair. There was blood from his wound smeared all over the wall and the chair he was sitting in.

{¶8} J.G. told the officers that he suffered from post-traumatic stress disorder ("PTSD"). He expressed his frustration with being touched by the officers, stating that "I am sorry, you're not gonna f***ing put your hands around my neck." Officer McCoy told J.G. that his mom was on her way, and that if she gave the officers permission to treat J.G.'s injuries, J.G. would not have a choice in that matter. Officer McCoy asked J.G. to "work with us so we can work with you." J.G. then agreed to let fire department personnel bandage his wrist.

{¶9} The situation deescalated during this period and remained calm thereafter. J.G. was left alone in the room, sitting in the chair, with his wrists handcuffed behind his back, for approximately seven minutes until the paramedics with the Cincinnati Fire Department arrived. During this time, J.G. can be seen grimacing in pain due to his wrist injury, which was still bleeding onto the chair. J.G. was clearly uncomfortable, frustrated, and distressed.

---

[2] Officer McCoy is referred to as both "officer" and "detective" throughout these proceedings. For consistency, we refer to him as an officer.

{¶10} After J.G.'s wrist was bandaged, his handcuffs were removed from behind his back, and one arm was handcuffed in front of him to a table loop. Detective Gettys attempted to read J.G. a form that contained his *Miranda* rights while the handcuffs were being switched, but stopped to wait until Officer McCoy finished handcuffing J.G. to the table loop. Once J.G. was situated, Detective Gettys started over and quickly read J.G. his *Miranda* rights. When asked if he understood those rights, J.G. initially responded by nodding his head, but when asked again, he verbally answered yes.

{¶11} J.G.'s mother entered the room as these rights were being read and sat down next to him at the table. Officer McCoy and Detective Gettys began interviewing J.G, who denied both having been in the house that was burglarized and breaking any of its windows. He told the officers that he injured his wrist when he fell walking home from school earlier that day and cut his wrist on glass. Approximately one and a half minutes after the questioning began, J.G. was told by one of the officers that his mother had a question for him. J.G's mother instructed him not to lie and stated, "If you do not tell me the truth on this and come clean if you did or did not do it, I am giving them permission to do a DNA test on you and if it comes back that it's your blood that is anywhere there, you're gonna be in a world of trouble not only with them but with me." Following his mother's admonition, J.G. continued to deny breaking the windows on the house, but admitted that his blood would be found inside the home. He stated that, "as a curious kid," he had entered the house and that blood dripped from his injured wrist while he was inside.

{¶12} J.G.'s mother continued to press him on his explanation, stating, "[D]on't sit there and cry because you got your a** in a mess. You better come clean if

you did it." As J.G. continued to deny breaking into the house, his mother turned to the officers and stated, "Go ahead and do the DNA." She then told J.G., "So you better come clean about it." J.G. reiterated that his blood would be found in the house because he had entered it with an open cut.

{¶13}   Detective Gettys quickly read advisements from a DNA consent form to J.G. Among other warnings, the form advised J.G. that he had the right to refuse to consent to providing his DNA. After Detective Gettys and J.G.'s mother signed the form, Detective Gettys passed it to J.G. and told him to sign it. J.G. did so, bleeding on the form in the process.

{¶14}   J.G.'s cheek was swabbed for his DNA. His mother then left the room and the interview continued. J.G. admitted that his blood would be found on the deck, in the kitchen, and in the living room of the burglarized home. One of the officers questioned the credibility of this statement and pointed out that blood was also found on a window frame, outside a window, and in a bedroom. After informing J.G. that he was going to be charged for the burglary, the officers further questioned his version of events. J.G. was asked if there was any reason why his DNA would be on the item used to break out the window on the home, why there would be video footage of him removing a Ring camera from the home, or why his blood would be found on the Ring camera. As the interview progressed, J.G. made further incriminating statements, including admitting that he had broken two of the windows on the home.

{¶15}   J.G.'s mother eventually reentered the interrogation room, and Officer McCoy encouraged J.G. to explain to his mother what he was feeling. For approximately 15 minutes J.G. and his mother spoke while Officer McCoy predominately observed. J.G. made an inaudible comment at one point about his

7

motivation for breaking the windows on the home, to which his mother responded, "I knew that's why. There was more to that than (inaudible)." Officer McCoy then stated, "That's why I wanted you to come in." After the interview concluded, J.G. was taken to the hospital for medical care and then detained.

{¶16} Complaints were filed against J.G. alleging that he was a delinquent child for committing acts that, if committed by an adult, would have constituted the offenses of burglary, criminal damaging, and falsification.

{¶17} J.G. filed a motion to suppress all statements made during his interview, arguing that both the waiver of his *Miranda* rights and his confession were not voluntary under the totality of the circumstances. He also sought to suppress any DNA evidence, arguing that the DNA was taken without a search warrant and that his consent was not voluntary. A juvenile court magistrate conducted a hearing on the motion to suppress. At the start of the hearing, counsel for J.G. clarified that he was not challenging whether there was probable cause for his arrest.

{¶18} Officer Mendenhall testified at the hearing, stating that he stopped J.G. for questioning after J.G. walked past the crime scene with blood on his jeans and hands. The video from Officer Mendenhall's body-worn camera was admitted into evidence and portions of it were played for the magistrate. It depicted the officers' entire interaction with J.G. from the moment of his stop until he was placed in the cruiser in handcuffs. Officer Mendenhall was questioned about the use of force on J.G. by the responding officers. He stated that the standard protocol for use of force was followed in this situation and explained that officers are trained to handcuff uncooperative suspects for transport. And he stated that a "use of force" report was not filled out following this encounter with J.G. because "it was not a use of force."

Officer Mendenhall explained why multiple officers were involved in handcuffing J.G., stating that "We were trying to get control over him and tried to get the handcuffs on him. And to try and minimize the amount of force that is given to him during that, we used three officers using a lighter force rather than one officer using, exerting more force." He additionally explained that the taser was used to try and get J.G. to comply with the officers' commands.

{¶19} Officer Mendenhall was also questioned about his use of force on J.G. in the interrogation room. He explained, "I placed my hand under his arm to help raise him out of the chair. And then he continued to resist and fly back in the seat, so I put my hand on his shoulder to stabilize him." After being shown a picture of him with his hand on J.G.'s shoulder, Officer Mendenhall agreed that J.G.'s foot was not on the ground in the photograph.

{¶20} Detective Gettys testified that he took photographs of J.G.'s injuries and read J.G. his *Miranda* rights. He also read J.G. the DNA consent form and obtained J.G.'s signature on that form. Detectives Gettys stated that J.G.'s mother was present when both forms were read. He testified that he had spoken with J.G.'s mother prior to entering the interrogation room about certain aspects of the case, including DNA and obtaining her consent to get DNA from J.G. He acknowledged that he gave J.G.'s mother the opportunity to ask J.G. questions during the interview, but testified that neither he nor Officer McCoy told her to do so. Rather, prior to entering the interrogation room, J.G.'s mother stated that she wanted to ask J.G. if he had committed these acts because she would know if he was lying. Detective Gettys testified about the information he knew about J.G. prior to interviewing him, including

the facts that J.G. was 15 years old, had a tenth-grade education, suffered from PTSD, was upset and bleeding from the wrist, and had no prior delinquency adjudications.

{¶21} Officer McCoy was the last witness to testify at the suppression hearing. He stated that when first stopped by the officers on the street, J.G. was initially "verbally noncompliant" and provided false information regarding his name. He later became "physically noncompliant" as well. When discussing the use of force on J.G., Officer McCoy testified that an "escort hold," which occurs "when you grab ahold of an arm or appendage to try and control the person," was used. He further stated that the taser, which was not turned on, was used as a de-escalation technique. Officer McCoy acknowledged that he was at the burglary crime scene when J.G. was arrested, that he was not present for the arrest, and that his testimony was based on his observation of the video from the body-worn camera and from speaking with other officers.

{¶22} Officer McCoy was asked about his warning to J.G. that if he acted up, "it's gonna be very bad." He stated that the purpose of this comment was to let J.G. know his options, which he described as "comply or there would be pain compliance that went along with that." Like Detective Gettys, Officer McCoy stated that he never told J.G.'s mother that she needed to ask questions during the interview, nor did he tell her that she needed to agree to sign the DNA consent form. Officer McCoy acknowledged that J.G.'s physical conduct initially showed that he was not willing to speak with the officers. However, Officer McCoy felt that he was able to calm down J.G. and have a conversation with him.

{¶23} The magistrate denied J.G.'s motion to suppress. J.G. filed objections to the magistrate's decision. He contended that the magistrate failed to properly determine the factual issues and appropriately apply the law, arguing that the waiver

of *Miranda* rights was not voluntary, his confession was not voluntary, and his consent to the warrantless DNA draw was not voluntary.

{¶24} The trial court found J.G.'s objections to be well-taken, and it set aside the magistrate's decision and granted J.G.'s motion to suppress. The court found that under the totality of the circumstances, both J.G.'s waiver of his *Miranda* rights and his confession were involuntary. It further found that J.G.'s consent to DNA testing was not voluntary. And despite the issue not being raised by either party, the court found that the officers "did not have sufficient 'reasonable articulable suspicion' to conduct a Terry Stop" on J.G.

{¶25} The state has appealed from the trial court's entry granting the motion to suppress.

## II. Motion to Suppress

{¶26} In its first assignment of error, the state argues that the trial court erred as a matter of law by suppressing J.G.'s statements and DNA draw.

### A. Standard of Review

{¶27} Our review of a trial court's ruling on a motion to suppress "presents a mixed question of law and fact." *State v. Wright*, 1st Dist. Hamilton No. C-210486, 2022-Ohio-2161, ¶ 11; *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We must accept the trial court's findings of fact as true if competent, credible evidence supports them. *Wright* at ¶ 11; *Burnside* at ¶ 8. But we then must "independently determine[], without deference to the trial court's conclusion, whether the facts satisfy the legal standard." *Wright* at ¶ 11; *Burnside* at ¶ 8.

### B. *Miranda* Waiver

**{¶28}** The state first argues that J.G.'s waiver of his *Miranda* rights was voluntary, knowing, and intelligent, and that the trial court erred in determining otherwise.

**{¶29}** Both the Fifth Amendment to the United States Constitution and Article 1, Section 10 of the Ohio Constitution provide that no person shall be compelled to be a witness against himself or herself in a criminal case. *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 30. This "constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults." *In re M.H.*, 163 Ohio St.3d 93, 2020-Ohio-5485, 168 N.E.3d 439, ¶ 17, quoting *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). "[A] set of prophylactic measures"—*Miranda* warnings—have been adopted to protect this constitutional privilege. *Id.* at ¶ 18, quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 269, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). The United States Supreme Court held in *Miranda v. Arizona* that a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). These warnings are only required when a suspect is subject to a custodial interrogation. *In re M.H.* at ¶ 19. It is not disputed that J.G. was subject to a custodial interrogation in this case or that *Miranda* warnings were required.

**{¶30}** After the required warnings have been provided, a suspect may elect to waive his rights and speak with law enforcement or make a statement. *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 34. An express waiver of the

rights, either orally or in writing, is not required. *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 11; *State v. Jackson*, 1st Dist. Hamilton No. C-210466, 2022-Ohio-2562, ¶ 36. A waiver may be inferred "from the suspect's behavior, viewed in light of all the surrounding circumstances." *Lather* at ¶ 11, quoting *State v. Murphy*, 91 Ohio St.3d 516, 518, 747 N.E.2d 765 (2001). "One such circumstance in which a waiver can be inferred is where a defendant proceeds to speak after having been advised of her or his rights and indicating an understanding of them." *Jackson* at ¶ 36, citing *State v. Williams*, 2d Dist. Montgomery No. 28648, 2021-Ohio-1340, ¶ 55. However, a waiver will not be presumed based merely on a suspect's response to an interrogation. *State v. Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, ¶ 22, citing *State v. Edwards*, 49 Ohio St.2d 31, 38-39, 358 N.E.2d 1051 (1976), *vacated as to death penalty,* 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

{**¶31**}  A waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct.1135, 89 L.Ed.2d 410 (1986). The state bears the burden of proving by a preponderance of the evidence that the accused's waiver of his *Miranda* rights was knowing, intelligent, and voluntary. *Wesson* at ¶ 34; *Jackson* at ¶ 33. The totality of the circumstances is examined to determine whether a waiver met these requirements. *State v. Barker,* 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 24; *Jackson* at ¶ 32.

{**¶32**}  Typically, considerations under the totality-of-the-circumstances test include "the age, mentality, and prior criminal experience of the accused; the length,

intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Wesson* at ¶ 35, quoting *Edwards* at paragraph two of the syllabus. But "[w]hen the suspect is a juvenile, the totality of the circumstances includes 'the juvenile's age, experience, education, background, and intelligence' as well as his 'capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " *Barker* at ¶ 24, quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). A parent's involvement and advice are also relevant. *Id.* at ¶ 24. An analysis of the totality of the circumstances "takes on even greater importance when applied to a juvenile." *Id.* at ¶ 39. A "court[] should take 'special care' in scrutinizing a purported confession or waiver by a child." *In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 106, quoting *In re Manuel R.*, 207 Conn. 725, 737-738, 543 A.2d 719 (1988), citing *Haley v. Ohio*, 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948).

{¶33} Both the Ohio Supreme Court and this court have recognized that "a waiver is not involuntary *unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." *Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, at ¶ 35; *see Jackson*, 1st Dist. Hamilton No. C-210466, 2022-Ohio-2562, at ¶ 33 ("Absent evidence that an accused's will was overborne or his capacity for self-determination was critically impaired because of coercive police conduct, a waiver of *Miranda* rights will be considered voluntary.").

{¶34} In this case, J.G. acknowledged that he was read and he understood his *Miranda* rights, first by nodding his head and then by verbally stating that he understood them. J.G. did not expressly waive his *Miranda* rights because the form

14

read to him merely set forth each *Miranda* right. The form did not state anything about a waiver of those rights. In addition, J.G. was never asked whether he waived his *Miranda* rights, but only whether he understood his rights. He made no express waiver of those rights, either orally or in writing. Thus, we must examine whether we can infer that J.G. waived his *Miranda* rights.

{¶35} J.G. proceeded to speak with Detective Gettys and Officer McCoy, in his mother's presence, after acknowledging that he understood his rights and without requesting an attorney. Under these circumstances, a waiver of J.G.'s *Miranda* rights may be inferred from his behavior. *See Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, at ¶ 11. But we also must determine whether, under the totality of the circumstances, the state proved by a preponderance of the evidence that J.G.'s waiver was voluntary.

{¶36} The trial court's entry discusses in detail the force used by the officers against J.G. Those findings were indisputably supported by the record, i.e., the video evidence of both the arrest and the interrogation. However, the trial court failed to mention that it was J.G.'s combative behavior that prompted the officers' actions. In fact, the trial court made no findings as to J.G.'s behavior, when the video of the interview admitted into evidence clearly established that J.G. shouted at the officers, kicked a chair on two occasions, and struggled with the officers. We take these facts into consideration when applying the facts to the relevant law.

{¶37} J.G. was 15 years old, "a tender and difficult age for a boy," and he "cannot be judged by the more exacting standards of maturity." *Haley*, 332 U.S. at 599, 68 S.Ct. 302, 92 L.Ed. 224. It is well-recognized that a juvenile like J.G. "is unable to know how to protect his own interests or how to get the benefits of his constitutional

rights." *Gallegos v. Colorado*, 370 U.S. 49, 54, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); *see Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, at ¶ 39. His age alone "does not render his waiver involuntary," *State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 18, but it plays an important role in our analysis of the totality of the circumstances. J.G. had a tenth-grade education. He had no prior adjudications and no experience with the criminal justice system. He suffered from PTSD and informed the officers of that diagnosis.

{¶38} Significant force was used on J.G. when he was taken into custody. This force occurred after J.G. was told that he was not being arrested, but was being taken to the police station for questioning. When J.G. failed to immediately comply, he was swarmed by multiple officers. One held a taser to his back, while three others held him so that his wrists could be handcuffed behind his back, causing his previously incurred cut to bleed.

{¶39} After being placed in an interrogation room at the station, J.G. was emotionally distraught and requested—unsuccessfully—that his handcuffs be removed. His wrist was still bleeding. J.G. refused to stand for a photograph to be taken of his injury, and he told the officers not to touch him. He shouted at the officers and kicked a chair. Initially, one officer approached J.G., lifted him out of a chair, and held him against the wall. J.G. continued to struggle, and he was again subdued by multiple officers. The force used to restrain J.G. against the wall was so severe that his foot was lifted off of the ground. One officer restrained J.G. by the neck, while J.G. shouted for the officer to remove his hands. At one point, the small room contained J.G. and six officers, three of which were restraining him. J.G.'s blood was smeared on a chair and on the wall.

16

**{¶40}** Once J.G. was subdued, Officer McCoy told him that if he acted up again, it was going to "be very bad." As explained by Officer McCoy, this statement meant "comply or there would be pain compliance that went along with that." Officer McCoy was the same officer that participated in the interview of J.G.

**{¶41}** J.G.'s *Miranda* rights were read to him while he was handcuffed to a table, approximately 15 minutes after the officers used force against him. The *Miranda* rights were not thoroughly and carefully administered to J.G. Rather, they were hastily read by Detective Gettys. The entire recitation took approximately 20 seconds, and the detective did not pause between each right to ensure that J.G. understood the right that had been read. While J.G. was asked if he understood his rights, he was never asked if he wished to waive those rights before speaking with the officers. J.G.'s mother was in the room while the rights were read, but she was not involved in the recitation or in ensuring whether J.G. understood them or wished to waive them.

**{¶42}** J.G. did not immediately admit any wrongdoing when speaking with the officers. Less than two minutes into the interview, upon prompting from an officer, J.G.'s mother questioned him. She threatened J.G., stating that if he did not tell the truth she would give the officers permission to do a DNA test. The officers did not correct mother's misstatement and inform J.G. that his own consent was also necessary before a sample of his DNA could be taken. Immediately after mother's threat, J.G. admitted to having been in the house that was burglarized. Shortly thereafter, J.G.'s mother turned to the officers and told them to do the DNA test. After the DNA consent form was read to J.G. and signed by his mother and an officer, the officer passed it to J.G. and told him to sign it. J.G. was not asked if he wished to

consent to the DNA test or told that he did not have to sign the form. Rather, he was instructed to sign it. After his cheek was swabbed, J.G. made a full confession.

{¶43} While J.G.'s mother was not a state actor, she played a significant role in impacting J.G.'s state of mind and her behavior is relevant to our analysis. "[A] parent's participation may militate for or against a finding of voluntariness depending on the circumstances." *State ex rel. M.P.*, 476 N.J.Super. 242, 267, 299 A.3d 133 (2023) ("The actual role played by a parent during a stationhouse interrogation— whether as a 'buffer' or instead as an adjunct law enforcement interrogator—is a fact-sensitive question to be determined on a case-by-case basis."). J.G.'s mother was undoubtedly a concerned parent who cared about her child. But it was also clear that she was not there to advise or help J.G. understand his rights, but rather to encourage him to be truthful and cooperate with the police. Her coercive behavior militates against a finding of voluntariness.

{¶44} The officers' coercion of an injured, agitated 15-year-old J.G., who had no prior experience with the criminal justice system, clearly had an impact on his state of mind. The record does not demonstrate, nor do we find, that the officers used force *in order to get J.G. to confess*. Rather, they resorted to force in the first instance because J.G. would not voluntarily go to the police station with them for questioning. They used force in the interrogation room because J.G. would not comply with their demands to stand for a photo of his injured wrist. Although the officers' actions were not undertaken in order to force a confession, they were nonetheless coercive. *See Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, at ¶ 35 (police coercion includes physical abuse and threats). Detective McCoy threatened J.G. that if he acted up again, it would be very bad for him. J.G. had already been forcibly handcuffed by

multiple officers, resulting in the reopening of his wound, and then he was shoved into the wall and forced to stand against his will by multiple officers. On top of that, he faced the threat of more force being used against him if he failed to comply with the police.

{¶45} We do not make any findings in this opinion that the officers' use of force was excessive or even unjustified. J.G.'s behavior during his interaction with the officers was less than ideal and clearly precipitated the officers' actions. But the circumstances under which J.G. was taken into custody and the amount of force employed against him both at that time and then again in the interrogation room are relevant to determining J.G.'s state of mind and the voluntariness of his *Miranda* waiver. The record contains evidence that J.G.'s will was overborne by the coercive police conduct, specifically the officers' use of force and threats of future harm. *See Jackson*, 1st Dist. Hamilton No. C-210466, 2022-Ohio-2562, at ¶ 33 (holding that "evidence that an accused's will was overborne or his capacity for self-determination was critically impaired because of coercive police conduct" is required in order to find a *Miranda* waiver involuntary).

{¶46} The dissent expresses concern that an accused should not be allowed to reap the benefit of engaging in behavior that precipitates an officer's use of force. The dissent contends that the use of force in this case does not satisfy the initial threshold of coercive police conduct. However, we do not hold that police engage in coercive conduct every time they use force in response to a suspect's actions. Rather, there are several factors that made the officers' use of force so coercive *in this particular case*. First, the officers told J.G. that he was not being placed under arrest, but that they wanted him to voluntarily come with them to the police station for questioning,

19

implying that J.G. had a choice in the matter. When J.G. said no, multiple officers immediately grabbed him, forced him against the cruiser, held a taser to his back, threatened to use it, handcuffed his wrists behind his back, and forced him into the cruiser. These facts are extremely relevant to our determination that the force employed amounted to police coercion. Second, although J.G. may have precipitated the force used in the interrogation room, the fact that the officers used significant force against J.G. for a second time when he failed to comply with their demands is also relevant to our determination that the force amounted to police coercion. Finally, and most importantly, the dissent completely fails to mention or consider the impact on J.G.'s will and whether his will was overborne when, after being roughed up twice when he failed to comply with their demands, one of the officers threatened future force against him should he continue to fail to comply. Under these specific circumstances, we find that the officers' use of force was coercive.

{¶47} We cannot find that J.G.'s waiver was the product of a free and deliberate choice rather than intimidation and coercion. *See Moran*, 475 U.S at 421, 106 S.Ct. 1135, 89 L.Ed.2d 410. The previous use of force by the officers, the threat of the use of future force, the questioning of J.G. by the same officer that used force against him, and the coercive behavior by J.G.'s mother, coupled with J.G's age, current emotional state, and lack of experience with the criminal justice system, resulted in the waiver of his *Miranda* rights being involuntary under the totality of the circumstances. We accordingly hold that the trial court did not err in so concluding and in suppressing his statements made during the interview.

{¶48} While the same totality-of-the-circumstances analysis is applicable to determine whether J.G.'s confession was voluntary, we need not undertake that

analysis because the confession was properly suppressed based on the finding that J.G.'s *Miranda* waiver was not voluntary. *Jackson,* 1st Dist. Hamilton No. C-210466, 2022-Ohio-2562, at ¶ 32 ("Both of [appellant's] arguments—that his *Miranda* waiver was not knowing, voluntary, and intelligent, and that his confession was not voluntary—are analyzed under a totality-of-the-circumstances test.").

### C. DNA Draw

**{¶49}** The state next argues that the trial court erred in finding that J.G.'s consent to the DNA draw was not voluntary.

**{¶50}** Both "[t]he Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio Constitution prohibit unreasonable searches and seizures." *Wright*, 1st Dist. Hamilton No. C-210486, 2022-Ohio-2161, at ¶ 12, citing *State v. Ward*, 2017-Ohio-8141, 98 N.E.3d 1257, ¶ 13 (1st Dist.). "[U]sing a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search." *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 100, quoting *Maryland v. King*, 569 U.S. 435, 446, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013).

**{¶51}** Here, the state obtained J.G.'s DNA swab without a warrant. As such, the search was per se unreasonable unless an exception to the warrant requirement applied. *Wright* at ¶ 12. Consent of the person to be searched is one such exception. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Hayden*, 1st Dist. Hamilton No. C-210352, 2022-Ohio-3933, ¶ 17. To be valid, consent must have been given voluntarily and not have been the result of duress or coercion. *Schneckloth* at 248. Whether a consent to search was voluntary is a question of fact to be determined based on the totality of the circumstances. *Id.* at 227; *State v. Smith*, 1st Dist. Hamilton No. C-200352, 2021-Ohio-2654, ¶ 32. The state

bears the burden of proving by clear and convincing evidence that the consent was voluntary. *Smith* at ¶ 32.

{¶52} Our previous analysis of the totality of the circumstances is relevant to determining whether J.G. freely and voluntarily consented to providing a DNA sample. J.G. was an emotional, injured 15-year-old who suffered from PTSD and had just experienced the use of force against him by police officers twice in a short period. He had further been threatened with the use of future force for noncompliance. J.G.'s mother then threatened him by stating that she was going to give the police permission to do a DNA test to determine if it was his blood in the burglarized house. The officers did not clarify his mother's statement and explain that his own consent was also necessary before a DNA sample could be taken. A few minutes later, seemingly unsatisfied with J.G.'s explanation, his mother instructed the officers to do the DNA test. J.G. had been in the interrogation room for approximately 27 minutes, and questioned by the offices for five minutes, at this point.

{¶53} After the DNA consent form was hastily read to J.G. and signed by his mother and Detective Gettys, it was passed to J.G. and he was told to sign it. J.G. was not asked if he had any questions about the form or asked if he wanted to consent to providing a DNA sample. Although the language of the form stated that he had the right to decline to consent, the collective behavior of his mother and Detective Gettys gave J.G. the impression that he had no choice other than to sign the form. Under these circumstances, the record does not contain clear and convincing evidence that J.G.'s consent to the search was voluntary. *See Smith* at ¶ 32.

{¶54} We accordingly hold that the trial court did not err in suppressing all evidence related to the DNA draw. The first assignment of error is overruled.

### III. Additional Grounds for Suppression

{¶55} The state argues in its second assignment of error that the trial court erred as a matter of law by granting the motion to suppress on grounds not raised by J.G. or addressed by the parties. The state specifically challenges the trial court's findings and conclusions concerning whether there was probable cause and/or reasonable suspicion to both initially stop J.G. and to then conduct a *Terry* stop.

{¶56} In our resolution of the first assignment of error, we upheld the trial court's suppression of J.G.'s statements and all DNA-related evidence. The trial court did not suppress any additional evidence based on its findings related to the stop. We accordingly hold that this assignment of error has been rendered moot by our resolution of the first assignment of error.

### IV. Conclusion

{¶57} The trial court did not err in suppressing J.G.'s statements and all DNA evidence based on its findings that J.G.'s waiver of his *Miranda* rights was not voluntary under the totality of the circumstances and that he did not voluntarily consent to the warrantless search of his person. The judgments of the trial court are accordingly affirmed.

Judgments affirmed.

**BOCK, J.,** concurs.
**WINKLER, J.,** concurs in part and dissents in part.

**WINKLER, J.,** concurring in part and dissenting in part.

{¶58} I respectfully dissent in part and concur in part. I disagree with the majority that J.G.'s *Miranda* wavier was involuntary but I agree with the majority that

J.G.'s consent to the DNA draw was involuntary given the circumstances of the purported waiver.

**{¶59}** I agree with the majority that J.G. implicitly waived his *Miranda* rights when his rights were read to him from a form setting forth each *Miranda* right, J.G. was asked twice if he understood those rights and J.G. first nodded then replied, "[Y]eah," and J.G. proceeded to speak with Detective Gettys and Officer McCoy. *Jackson*, 1st Dist. Hamilton No. C-210466, 2022-Ohio-2562, at ¶ 36 (holding a "circumstance in which a waiver can be inferred is where a defendant proceeds to speak after having been advised of her or his rights and indicating an understanding of them."), citing *State v. Williams*, 2d Dist. Montgomery No. 28648, 2021-Ohio-1340. We must treat this assent as "strong proof" of the validity of the waiver. *State v. Moore*, 81 Ohio St.3d 22, 32, 689 N.E.2d 1 (1998); *State v. Washington*, 1st Dist. Hamilton No. C-130213, 2014-Ohio-4178, ¶ 33.

**{¶60}** My disagreement with the majority's analysis concerns the narrow issue concluding the use of force was not intended to get J.G. to confess, while acknowledging J.G.'s behavior clearly precipitated the officers' actions but nevertheless determining the police's use of force was coercive conduct. It creates a troubling opportunity for an accused to be the architect of the basis for facts supporting the suppression of his own statements by resisting the police until the officers are required to use force against him and then reaping the benefits of precipitating the use of force.

**{¶61}** The Ohio Supreme Court and this court both recognize that evidence of police coercion is a necessary predicate to finding a *Miranda* waiver involuntary. *See Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, at ¶ 35; *accord Jackson*

at ¶ 33 (holding a *Miranda* wavier will be considered voluntary without "evidence that an accused's * * * capacity for self-determination was critically impaired because of coercive police conduct"). In my view, the majority skips this determination and impliedly concludes that because the police's use of force is properly relevant to determining J.G.'s state of mind and the voluntariness of his *Miranda* waiver, that the police use of force necessarily was coercive police conduct.

{¶62}   The record does not demonstrate that the officers used force in order to compel J.G. to confess. At every juncture, the police use of force was clearly precipitated by J.G.'s behavior. Nor was the force employed punitive in nature. The police initially used force to take J.G. into custody after J.G.'s demeanor turned from relatively cordial to combative when J.G. attempted to shake off an officer's arm when officers attempted to place handcuffs on him. Later, while J.G. was in custody and in the interview room, he refused to stand to allow officers to photograph his wrist. Police had to once again resort to force by standing J.G. up and maneuvering him so that an officer could take photographs of J.G.'s injured wrist. During this event, J.G. resisted the officers, struggled to break free, and kicked over a chair. It is not coercive police conduct to request one to stand and be photographed and then resort to the appropriate use of force to restrain a person who is noncompliant and attempting to break free.

{¶63}   While certainly the police's use of force is a consideration in reviewing the totality of the circumstances and, as a practical matter, the use of force generally is not indicative of a voluntary *Miranda* waiver in this analysis, but the use of force here does not satisfy the initial threshold of coercive police conduct. As *Wesson* describes by example, coercive police conduct includes the intensity of interrogation,

"physical deprivation or mistreatment," "threats," or "physical abuse." *See Wesson* at ¶ 35. Such phrases imagine force that is unnecessary, excessive, unjustified, punitive, or intentionally coercive. It does not imagine the necessary and appropriate force inherent in arresting a person that refuses to be arrested. Nor does it contemplate the use of force merely to maneuver a noncompliant person to be photographed who refuses and resists attempts to do so. To ignore J.G.'s behavior that clearly precipitated each use of force and treat it as inherently coercive allows J.G. to create the arguments in favor of suppression of his statements by precipitating a forcible response and then arguing that the police coerced him.

{¶64}  Accordingly, based on the record before us, I conclude the use of force was not coercive and would hold J.G.'s *Miranda* waiver was voluntary and that the trial court erred in suppressing J.G.'s statements. Because I concur that J.G.'s separate consent to provide a DNA sample was involuntary, I would hold that the trial court did not err in suppressing the evidence related to the DNA draw.

{¶65}  I respectfully concur in part and dissent in part.

Please note:

The court has recorded its entry on the date of the release of this opinion.

26