2024 WI App 45

# COURT OF APPEALS
# DECISION
# DATED AND FILED

## July 25, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP396-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2021CF8

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-APPELLANT,

 V.

LOGAN T. KRUCKENBERG ANDERSON,

   DEFENDANT-RESPONDENT.

APPEAL from an order of the circuit court for Green County: THOMAS J. VALE, Judge. *Affirmed in part; reversed in part and cause remanded.*

Before Kloppenburg, P.J., Blanchard, and Taylor, JJ.

¶1    TAYLOR, J. Logan T. Kruckenberg Anderson (Kruckenberg) moved to exclude as evidence all of the statements he made to law enforcement in multiple interviews over the course of three days, when he was 16 years old,

including statements that, on a January day, he left his newborn child, A.B., in the woods where the child died.[1] The circuit court granted Kruckenberg's suppression motion in part and entered an order excluding all statements Kruckenberg made to Special Agent James Pertzborn over the course of approximately four hours on January 10, 2021, at the Brodhead Police Department, at the Albany woods, and at the Albany Police Department, on two grounds: (1) Kruckenberg's statements were involuntary under a constitutional voluntariness analysis, and (2) Kruckenberg was subject to custodial interrogations without having been given the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶2 We agree with the circuit court in part. We conclude that, under the totality of the circumstances, the State has not met its burden of proving that Kruckenberg's January 10 statements, after a certain point at the Brodhead Police Department and including all of his statements at the Albany woods and at the Albany Police Department, were voluntary under constitutional standards. Therefore, the court properly suppressed those statements. However, we also conclude that the State met its burden of proving that, up until that same point at the Brodhead Police Department, Kruckenberg's statements were voluntary and he was not in custody. Therefore, we reverse the circuit court on that issue.

---

[1] We will refer to the defendant as Kruckenberg, following the State's representation in its briefing that this is the last name typically used by the defendant and seeing nothing in the record to undermine that representation.

Consistent with the policy of protecting victim privacy under WIS. STAT. RULE 809.86(4) (2021-22), we use initials that do not correspond to actual names to refer to all individuals other than Kruckenberg, the members of law enforcement, and a psychologist called as a defense witness during the suppression hearing.

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

## BACKGROUND

### A. Procedural Background

¶3      From January 9 to 11, 2021, Kruckenberg was questioned by law enforcement officers in multiple interviews about his missing child, A.B., who was born a few days earlier.[2]  Kruckenberg was ultimately arrested and charged with first-degree intentional homicide and moving, hiding, or burying the corpse of a child, namely, A.B.

¶4      Kruckenberg moved to suppress the statements he made to law enforcement during this series of interviews.  Kruckenberg argued that his statements made in the following pre-arrest interviews were both involuntary and the result of an unlawful custodial interrogation in which no *Miranda* warnings were given:  (1) a January 9 early morning interview at the family residence of Kruckenberg's girlfriend, C.D.; (2) a January 9 afternoon interview at the Albany Police Department ("Albany PD"); and (3) January 10 early morning interviews at the Brodhead Police Department ("Brodhead PD"), an Albany woods location, and a second interview at the Albany PD.  Kruckenberg also alleged that his post-arrest statements during a January 10 afternoon interview at the Rock County Juvenile Detention Center and a January 11 evening interview at the Rock County Sheriff's Department should be excluded as evidence because his waivers of his *Miranda* rights and his subsequent statements were involuntary.

---

[2] During the circuit court's oral ruling, the court made a factual finding that the State's Exhibit 100, which outlined the timeline of law enforcement officers' contacts with Kruckenberg between January 9 and January 11 pertinent to the suppression motion, including the dates, the times, the length of questioning and the individuals present, was accurate.  Neither party challenges this finding or the court's reliance on this exhibit in its suppression decision.

¶5 In response to Kruckenberg's suppression motion, the circuit court conducted an evidentiary hearing that stretched over parts of six days from June through October 2022. At the hearing, the State presented testimony of the law enforcement officers who interviewed Kruckenberg as well as audiovisual recording evidence and transcripts of these interviews. Kruckenberg presented testimony from E.F., the mother of a friend of Kruckenberg with whose family Kruckenberg lived, and Dr. Brian Cutler, a social and forensic psychologist.

¶6 In January 2023, the circuit court issued an oral ruling in which it granted Kruckenberg's motion to suppress as evidence all of the statements he made to Special Agent Pertzborn on January 10 at the Brodhead PD, at the Albany woods, and during the second interview at the Albany PD. The court ruled that all of these statements were involuntary and occurred during a custodial interrogation without *Miranda* warnings. The court relied in part on a finding that the interviews conducted by Pertzborn at these separate locations constituted "one continuous interview that never ended" until Kruckenberg's arrest. The circuit court did not exclude Kruckenberg's statements in the other challenged interviews.

¶7 The State appeals the circuit court's suppression order, arguing that Kruckenberg's suppressed statements were voluntary and were not the product of a custodial interrogation. Kruckenberg does not appeal the portions of the court's order denying his motion to suppress his statements in the other interviews that he initially challenged.

### B. Factual Background

¶8 In the following summary, we blend the circuit court's factual findings with undisputed material facts, unless otherwise indicated. We may not disturb a circuit court's factual findings unless they are clearly erroneous. *See*

4

*Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784 ("We will upset a finding of fact only if it is clearly erroneous.").

### 1. Interviews at C.D.'s Residence

¶9 At around 2:00 a.m. on January 9, 2021, law enforcement officers arrived at a residence in Albany, Wisconsin, to investigate a report of a missing newborn baby, A.B. The residence was that of Kruckenberg's fourteen-year-old girlfriend, C.D. At the residence, the officers spoke with Kruckenberg, C.D., and members of C.D.'s family. The officers learned that Kruckenberg and C.D. were the parents of A.B., and that C.D. had given birth in her residence four days earlier without the knowledge of her own parents. Kruckenberg told the officers that, on the day that C.D. gave birth, he gave A.B. to his friend "Tyler" to take to an adoption agency, but that Kruckenberg had not communicated with Tyler since and did not have any contact information for him. At one point, a detective questioned Kruckenberg alone in a squad car for about 40 minutes. At around 6:00 a.m., an officer drove Kruckenberg to his mother's residence.

¶10 During the interviews at C.D.'s residence, law enforcement officers did not handcuff or physically restrain Kruckenberg or anyone else. Although the officers emphasized the seriousness of the situation and occasionally expressed disbelief at Kruckenberg's narration of events, they were generally focused on gathering facts, not accusing Kruckenberg of any wrongdoing or explicitly attempting to elicit incriminating statements. The law enforcement interviews at C.D.'s residence lasted approximately four hours.

## 2. First Albany PD Interview

¶11 At 2:00 p.m. on January 9—approximately eight hours after the conclusion of the morning interviews at C.D.'s residence—law enforcement officers, including the detective who had questioned Kruckenberg in the squad car earlier that morning, contacted Kruckenberg at E.F.'s residence for further questioning about A.B. Kruckenberg had a close relationship with E.F. and had been living with E.F.'s family since the previous summer. The officers asked Kruckenberg to accompany them to the Albany PD to answer additional questions about A.B. and told him that he was not under arrest. Kruckenberg agreed to answer questions and accompany them to the Albany PD. Before departing, the officers told Kruckenberg to turn over his cell phone, and Kruckenberg did so.[3] Besides the officers, no other individual accompanied Kruckenberg to the Albany PD.

¶12 Because the Albany PD did not have a dedicated interview room, the officers interviewed Kruckenberg in a "patrol room" that contained computers and other police equipment. The officers told Kruckenberg that he was free to leave and asked Kruckenberg for more details about the events on the day when A.B. was born. Kruckenberg reiterated his version of events that, on the morning of A.B.'s birth, he gave A.B. to his friend "Tyler" to take to an adoption agency. The

---

[3] It does not appear from the record that the officers had a warrant to seize or search Kruckenberg's cell phone at the time he gave his first cell phone to law enforcement. Nevertheless, during the Albany PD interview, an officer said that, because of Kruckenberg's narration of events following A.B.'s birth, they would be keeping his phone because "everything you ever did on this is inside of this phone, whether you deleted it or not." Subsequently, Kruckenberg apparently signed a consent for the seizure or search of the phone and provided his cell phone passcode to the officers. In any event, Kruckenberg does not argue that the officers improperly seized and searched his cell phone, so we do not address those issues in this opinion.

audiovisual recording of this portion of the interview depicts Kruckenberg beginning to cry and an officer responding by handing Kruckenberg a tissue. Kruckenberg also said that he had not slept, eaten, or drunk anything besides water over the last three days. At several points during this interview, Kruckenberg told the officers that he almost vomited, that he could not keep solids or liquids down, and that he was having stomach pains. Kruckenberg asked to go home and said that he "[c]an't wait to sleep and eat." E.F. came to pick up Kruckenberg around 5:00 p.m. E.F. testified that an officer told her to not let Kruckenberg leave her property, although the officer testified that he had not told her that. In any case, E.F. testified that she told Kruckenberg that he could not leave her property because an officer gave her that direction.

¶13 At no point during this interview did officers frisk, handcuff, or physically restrain Kruckenberg. As during the questioning at C.D.'s residence, the officers primarily asked fact-gathering questions and did not accuse Kruckenberg of any wrongdoing in connection with the disappearance of A.B. Nonetheless, the officers expressed disbelief at Kruckenberg's version of events and urged him to make things right and to tell them what occurred. They also told him that cadaver dogs were searching the area and they emphasized the seriousness of the situation. The interaction at the Albany PD lasted about three hours.

### 3. Brodhead PD Interview

¶14 Just after 11:00 p.m. on January 9—about six hours after Kruckenberg returned to E.F.'s residence following the interview at the Albany PD—multiple law enforcement officers arrived unannounced at E.F.'s residence. Among these officers were Special Agent James Pertzborn with the Wisconsin

Department of Justice, Division of Criminal Investigations, and Special Agent Bryan Baker with the Federal Bureau of Investigation. Pertzborn asked Kruckenberg to answer additional questions about A.B. at the Brodhead PD, a ten- to fifteen-minute car ride away. Kruckenberg agreed to accompany Pertzborn and Baker to the Brodhead PD and answer additional questions. Before they departed from E.F.'s residence, an officer took a second cell phone from Kruckenberg. Pertzborn also advised Kruckenberg that he was not under arrest and did not have to answer questions. E.F. offered to drive Kruckenberg to the Brodhead PD herself, but Pertzborn declined that offer.

¶15 At around 11:30 p.m., Pertzborn and Baker drove Kruckenberg in Pertzborn's unmarked vehicle to the Brodhead PD and arrived there just after midnight on January 10. They took Kruckenberg to a windowless interview room with a table and four chairs and directed him to sit in a chair that was on the opposite side of the table from the two doors into the room. Pertzborn and Baker sat in the chairs nearest the doors. Kruckenberg was not frisked, handcuffed, or physically restrained. Pertzborn honored Kruckenberg's request that E.F. be present for the questioning about A.B. While waiting for E.F., Pertzborn and Baker conversed with Kruckenberg and asked him some questions about Kruckenberg's second cell phone that had been taken from E.F.'s residence.

¶16 E.F. arrived at the Brodhead PD around 12:40 a.m. and sat down at the table with Kruckenberg, Pertzborn, and Baker. Pertzborn reintroduced himself and Baker and reiterated that Kruckenberg was not under arrest, did not have to talk to him, and could "pick up and leave" at any time. Both Kruckenberg and E.F. said that they understood these advisements. E.F. recommended that Kruckenberg talk to the officers about A.B.

¶17    Before Kruckenberg began recounting his version of events, Pertzborn urged Kruckenberg to be cooperative and represented that Pertzborn could help Kruckenberg:

> I am in a position where I can help. Okay? As time moves on, as you know, these thing[s] kind of go away. And I can't always help…. It's a matter of let's fix it and move on from where we are at. That's all I care about at this point. But things get taken out of my control, so I always just try and convince people it's best for them to work with me early, because eventually people work with me and deal with it but … [i]t gets too late in the game and that's the problem. Okay? … I'm the one that can kind [of] come in, talk to them, deal with the issue and help the situation.

Pertzborn also suggested that he already knew what had happened to A.B.:

> S/A Pertzborn: … I am going to ask you a question. Do you know why I want to talk to you?
>
> [Kruckenberg]: Because as of right now we have no idea where that child is.
>
> S/A Pertzborn: No some of us do, but what I want you to do is talk to me. Alright? And walk me through this. Alright? How we got to this point. That's what I need you to do.
>
> [Kruckenberg]: Okay, so do you want me to start at like the day that [A.B.] was born?
>
> S/A Pertzborn: We can start wherever you feel we need to start, but I want you to know there's a whole bunch of information that we have, and we have done a whole lot of background on stuff[.] … I always tell everybody if you are going to talk to me, I can work [with] anything but I need you to have kind of an understanding I really need you to be honest with me. Alright, otherwise we are just wasting our time and we don't need that at all.

¶18    Kruckenberg began recounting his version of events, but Pertzborn soon interrupted and accused him of giving information that was inconsistent with C.D.'s account:

> S/A Pertzborn: You understand that this is being inconsistent with the information that [C.D.] provided, you understand that right?
>
> [Kruckenberg]: I do now.
>
> S/A Pertzborn: Yeah. No I think you knew it before, but you understand what you are telling me is inconsistent with what she is saying. Okay, go ahead.

¶19 Kruckenberg again attempted to recount his version—namely, that he had given A.B. to his friend "Tyler"—but Pertzborn soon interrupted him again and accused Kruckenberg of lying. At this point in the interview, Pertzborn's tone became stern, his language became accusatory, and his demeanor became confrontational. Pertzborn leaned over the table towards Kruckenberg, emphatically gesturing to Kruckenberg with his hands and occasionally touching Kruckenberg's hands, with E.F. interjecting at times:

> S/A Pertzborn: Listen, listen. I think that I need to talk to you. I need to interrupt you for a second.
>
> [Kruckenberg]: Okay.
>
> S/A Pertzborn: Alright? I know that you are not telling me the truth at this point.
>
> [Kruckenberg]: I am.
>
> S/A Pertzborn: No hold on, I know you aren't telling me the truth at this time and I have a problem with that because how am I going to help you when you are not telling me the truth. I can disprove it. Okay? And I need you to jump on board with me because if I am going to help [you], I'm putting my neck way out there for [you]. Okay? You need to step on board with me and stop with anymore lying. You need to! You need to, you need to, you need to.
>
> [E.F.]: Logan you gotta tell the truth okay?
>
> S/A Pertzborn: Listen, … I will listen to you until the cows come home. The problem being I will only listen to the things I know are true. I'm not going to listen to something that I know is 100% a lie, and you are going to go[,] how in the fuck does this guy know[?] Right? You're wondering

how does he know[?] I'm going to explain that to [you]. But for me to be able to put in a report that you have been cooperative so that I can help you. You're going to have to come with more of the truth. Alright? You've already dug in a little bit a[n]d I'm just going to tell you right now. I'm going to hand my hand down to you and lift you out of it. Alright? I ain't mad at [you], because I knew it was going to take a little bit of this. Everybody always does. You need to come forward. I can't help you, I'll step over you to help you, but you need to at least show me you are going to help yourself a little bit, because this is like simple, you understand? Please don't continue down this path.

[Kruckenberg]: I'm telling [--]

S/A Pertzborn: Don't continue.

[Kruckenberg]: [--] the truth.

S/A Pertzborn: No you are not. You're not! [(turns to E.F.)] You know him a lot better than I do and I know I am looking at your eyes and you're going[,] oh hell no.

[E.F.]: You gotta tell the truth[,] buddy. Please … please tell the truth.

S/A Pertzborn: You need … that's … I'm so glad she's here.

[E.F.]: Honey[,] I can't help you if you can't tell the truth.

[Kruckenberg]: I'm telling the truth.

S/A Pertzborn: Nothing.

[E.F.]: I will do anything in my power to help you if you tell the truth[,] honey.

¶20     Kruckenberg again attempted to tell Pertzborn he was telling the truth. But Pertzborn continued to interrupt him, to accuse him of lying, and to represent that Pertzborn's purpose in being present was to help Kruckenberg. Pertzborn also began to make moral appeals to Kruckenberg, asking Kruckenberg whether he is a person with a soul or an evil person:

S/A Pertzborn: Nothing that has happened here is too far from redeeming you. I can help you still, and I am willing to.

[E.F.]: I am too.

[Kruckenberg]: Can I [--]

S/A Pertzborn: There are people that are going to step up and help you, but we're not, we can't do that until you start realizing what's going on.

[Kruckenberg]: Can I ask you what the truth is then?

S/A Pertzborn: I am going to allow you the opportunity to tell me the truth. Because when I write it, if I sit there and have to say I had to do this, this and this to get you to even step on it. What kind of cooperation is that? There's no, there's no redeeming part of you that if, if you're not the one that is doing it. Right? If I have to continue to[,] like[,] prod you along. … Logan I'm gonna just take a break and I'm going to let you understand something. Every single path you take we already know a bunch of things about. Alright? I need you to bring it back and say listen Jim give me an opportunity to show you I am telling you the truth, because you're not right now, and I'm just going to forget about it and we are going to start over again. Do you understand? Please don't do this[.] [B]e honest for yourself. Alright?

[E.F.]: We can't help you if you won't tell us okay? But we will do everything in our power to help you.

S/A Pertzborn: Everything in our power to help you.

[E.F.]: I promise[,] Logan.

S/A Pertzborn: That's why I'm here is to help you.

[E.F.]: I'm not your mother.

S/A Pertzborn: But we can't do this anymore. We can't do the lies. I can't possibly, I can't possibly do that. Alright?

[E.F.]: Logan what did you guys do with the baby after [the baby] was born?

[Kruckenberg]: I'm telling the truth.

12

> S/A Pertzborn: You aren't. You aren't telling the truth. Alright? I think you know it and we know it, and there [are] two types of people, there's people that do things and have a soul and realize oh my lord I've done something that I can't fix and they feel bad about it. Or there is the other person, who make[s] a mistake and they're just evil about it, they don't give a shit. What type of person are you? What type of person are you?
>
> [Kruckenberg]: I care.
>
> S/A Pertzborn: You do care. That's why you're being given this opportunity to talk to me about this. That is why you are able to even work with me right now. Don't blow that chance. Okay? Please, you are not a bad person. You made a mistake. I get it and I understand that. Right? But it's all about what we do from here. Do you hear me? It's about what we do from here. Right? Can we start over?
>
> [Kruckenberg]: Yeah.

¶21 At this point, Kruckenberg said that he was "a person that doesn't like tight spaces" and asked to speak alone with Pertzborn. E.F. and Baker left the room. Pertzborn then reached over the table and clasped Kruckenberg's right hand in one of his own hands and held it steadily for about twenty seconds:

> S/A Pertzborn: Come here, give me your hand. [(Pertzborn clasps Kruckenberg's hand)] Alright, I'm going to help you through it. Alright? I'm going to help you through it.
>
> [Kruckenberg]: Okay.
>
> S/A Pertzborn: I know you're scared. I know and I'm going to help you. Just be honest with me. You got that? Let's work from what we know what happened. Let's just work on fixing it from here. [(Pertzborn releases Kruckenberg's hand)]

¶22 After Pertzborn released Kruckenberg's hand, the interview continued:

> [Kruckenberg]: So before we talk about this, can I ask what is going to happen?

13

> S/A Pertzborn: Sure, what is going to happen, I don't know, but what I know is going to happen because I am going to … write a report saying how cooperative and how apologetic you are for what happened. I'm going to be able to do that. Which weighs … a whole lot on where this all can go. Alright?
>
> We need to do a couple things. [W]e need to bury, give that precious child of yours, a proper burial.
>
> [Kruckenberg]: A burial. Yeah.
>
> S/A Pertzborn: We need to recover that body. Okay? I need you to tell me where [the child's] at right now.

At this point, Pertzborn testified that Kruckenberg got "teary-eyed" and tried to describe to Pertzborn through the Google maps feature on Pertzborn's cell phone where Kruckenberg had taken A.B. Kruckenberg described how he had put A.B. in a backpack on the day A.B. was born, walked to a wooded area in Albany with one of his friends, placed A.B. in a hollow tree, and "put [A.B.] under the snow."

¶23 Pertzborn then called another police officer on his cell phone and instructed Kruckenberg to provide directions to the wooded area in Albany where he had left A.B. After a few minutes, Pertzborn told the officer on the phone that he would drive with Kruckenberg so that Kruckenberg could direct them to the location. Kruckenberg initially said that he did not want to go with Pertzborn, but he eventually agreed. After Pertzborn ended the call with the other officer, Pertzborn called Baker back into the room, over Kruckenberg's objection. E.F. also reentered the room, and she and Kruckenberg shared a long, tearful hug.

¶24 E.F. then left the interview room, and Pertzborn, with Baker present, resumed questioning Kruckenberg. Pertzborn began with a more neutral, less accusatory tone than he had been using leading up to and including his comment about A.B. needing a "proper burial." Kruckenberg described how he and C.D. were not ready to be parents. He said that they did not know what to do with A.B.

or how to take care of A.B., were in a panic after A.B.'s birth, and eventually decided to abandon A.B. Kruckenberg explained that he left C.D.'s house with A.B. in a backpack, returned to his mother's house to retrieve a bigger backpack, and eventually ran into his friend "Alex." Kruckenberg asked Alex if he would drive him to an adoption agency in Madison, but Alex did not want to spend money on gas and suggested that Kruckenberg leave A.B. in the woods.

¶25 At this point, Pertzborn cut off Kruckenberg, reiterated that he was going to help Kruckenberg, and asked, "[D]o you trust that I'm going to help you?" Kruckenberg replied, "[Y]es[,] I do." Pertzborn then urged Kruckenberg to be honest and said that Kruckenberg's version of events "absolutely smells like shit." Kruckenberg insisted that he was telling the truth, offering to "pinky swear" that he was not lying. Kruckenberg began to cry. After a few more minutes of questioning, Pertzborn asked Kruckenberg to direct officers to the wooded area in Albany where he had left A.B., and Kruckenberg agreed on the condition that he not have to see A.B.'s body. Kruckenberg asked to ride with E.F. to the location, but Pertzborn denied his request and told Kruckenberg to ride with him. Pertzborn, Baker, and Kruckenberg left the Brodhead PD around 1:45 a.m.

### 4. The Albany Woods

¶26 Kruckenberg rode in Pertzborn's unmarked vehicle with Pertzborn and Baker, directing them to the area near the Albany woods where Kruckenberg said that he had left A.B. They arrived at the woods around 2:00 a.m., and Kruckenberg waited on the side of the road with law enforcement while officers searched the area. Kruckenberg was not handcuffed or restrained during this time.

¶27 A.B. was found, deceased, shortly thereafter. Pertzborn told Kruckenberg that he wanted to ask him more questions. Pertzborn again advised

Kruckenberg that he was not under arrest and was not required to answer questions. Kruckenberg agreed to additional questioning, but said that he did not want E.F. present. Around 2:30 a.m., Pertzborn and Baker drove Kruckenberg in Pertzborn's unmarked vehicle to the Albany PD.

### 5. Second Albany PD Interview

¶28 Pertzborn, Baker, and Kruckenberg arrived at the Albany PD a few minutes later, at around 2:35 a.m., roughly 45 minutes after leaving the Brodhead PD. Kruckenberg was escorted to a conference room. Kruckenberg was not handcuffed, and he sat at a table with Pertzborn, Baker, and another officer. Pertzborn advised Kruckenberg that he was still not under arrest and was not required to answer questions.

¶29 Kruckenberg recounted a version of events similar to what he had given at the Brodhead PD, after the point at which Pertzborn said that A.B. needed a "proper burial." At 4:10 a.m., Kruckenberg was arrested by a Green County Deputy Sheriff and told that he was being charged with homicide.

¶30 Kruckenberg was then driven to the Rock County Juvenile Detention Center. At around 2:00 p.m. on January 10 at the juvenile detention center, Kruckenberg was interviewed again and given *Miranda* warnings for the first time—fifteen hours after the law enforcement officers showed up unannounced at E.F.'s residence at 11:00 p.m. the night before. On January 11, Kruckenberg was interviewed again by Pertzborn and another special agent in a *Mirandized* interview at the Rock County Sheriff's Department. In these two *Mirandized* interviews, Kruckenberg made incriminating statements, including that he had shot A.B. twice before leaving A.B. in the woods.

16

### 6. Testimony of Dr. Cutler

¶31    During one of the suppression hearings, Kruckenberg called as a witness Dr. Brian Cutler, a social and forensic psychologist. Cutler testified that he reviewed the pertinent audiovisual recordings and transcripts of Kruckenberg's interviews with law enforcement to form an opinion as to whether Kruckenberg's statements to the police were voluntary. Cutler also prepared a report detailing his findings and opinions about the voluntariness of Kruckenberg's statements.

¶32    Cutler testified that there were high levels of pressure and significant levels of "coercion" (as defined in the field of psychology) present in Pertzborn's questioning of Kruckenberg at the Brodhead PD.[4] Cutler referenced several characteristics which, in his opinion, enhanced Kruckenberg's vulnerability during Pertzborn's interview, including Kruckenberg's young age, possible sleep deprivation, and the timing of the interview in the early morning following multiple previous interviews.

¶33    Cutler also identified two primary coercive techniques Pertzborn used in the Brodhead PD interview: "maximization techniques," in which the interrogator uses techniques to pressure the suspect to confess by convincing the suspect that the suspect has been "caught"; and "minimization techniques," in which the interrogator uses techniques to make it easier for a suspect to confess by presenting excuses for the conduct. Cutler identified the "maximization" techniques that Pertzborn employed as including repeatedly accusing Kruckenberg

---

[4] Dr. Cutler's psychological definition of coercion is "the use of tactics that limit the suspect's autonomy by manipulating perceived costs and benefits of various courses of action and/or depleting the suspect's ability or motivation to resist acceding to the pressure to confess."

of lying and of guilt, emphasizing the strength of the evidence, insinuating that Kruckenberg's lack of cooperation would be an aggravating factor in Kruckenberg's future treatment in the justice system, and asking Kruckenberg if he was a person with a soul who acknowledges wrongdoing or an evil person who does not "give a shit." Cutler identified the "minimization" techniques that Pertzborn employed as including presenting himself as an advocate for Kruckenberg, offering to help Kruckenberg, suggesting that a confession would be to Kruckenberg's benefit and result in leniency, and minimizing Kruckenberg's culpability.

¶34 To repeat, the circuit court excluded as evidence all of Kruckenberg's statements to Pertzborn during the January 10 interviews at the Brodhead PD, Albany woods, and Albany PD, concluding that these interviews constituted a single interview and that Kruckenberg's statements were involuntary and the result of a custodial interrogation without *Miranda* warnings. The State appeals.

## DISCUSSION

¶35 On appeal, the State argues that the circuit court erred in suppressing Kruckenberg's statements to Pertzborn during the January 10 interviews at the Brodhead PD, Albany woods, and Albany PD because: (1) Kruckenberg's statements were voluntary, and (2) Kruckenberg was not in custody for *Miranda* purposes, although the State concedes in its briefing on appeal that Kruckenberg

was "interrogated" for *Miranda* purposes.[5]  We conclude that the court properly excluded Kruckenberg's statements during the January 10 interrogations after Pertzborn's comment that the child needed a "proper burial" (the "proper burial" comment) because the State has not satisfied its burden of proving by a preponderance of the evidence that these statements were given voluntarily. Therefore, we affirm the court's exclusion of Kruckenberg's statements that followed Pertzborn's "proper burial" comment.[6]  This is the moment at which the State cannot show that Pertzborn's coercive techniques did not exceed Kruckenberg's ability to resist.  However, we reverse the court's exclusion of Kruckenberg's statements during the Brodhead PD interrogation prior to Pertzborn's "proper burial" comment, because we conclude that these prior statements were voluntarily made and that Kruckenberg was not in custody at the time.

---

[5] An "interrogation," as contemplated in *Miranda v. Arizona*, 384 U.S. 436 (1966), "refers not only to express questioning, but also to any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

[6] We note that, on this topic, the circuit court's order on its face excluded only Kruckenberg's statements to Pertzborn, but we interpret the order as logically being broader than that.  Although Pertzborn was the lead interrogator at the Brodhead PD, Albany woods, and second Albany PD interrogations and the vast majority of Kruckenberg's statements were directed to Pertzborn, there were other individuals present during those interviews to whom Kruckenberg arguably directed some statements.  We also note that the court's order excluded only Kruckenberg's statements at the Brodhead PD, Albany woods, and second Albany PD interviews, even though this series of interactions also included travel to the Albany woods and to the Albany PD.

The parties do not mention these aspects of the circuit court's order on appeal.  But we construe the circuit court's suppression of Kruckenberg's statements as including all statements Kruckenberg made during the Brodhead PD interview, while traveling to and while at the Albany woods, and while traveling to and during the second Albany PD interview.  This would be the only logical intent of the court given the court's comments on the record, the relevant evidence, and the arguments of the parties.

## I.  Standard of Review and Governing Principles

¶36     The Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article I, Section 8 of the Wisconsin Constitution require the State to show that a criminal defendant's statements were voluntarily made before the statements may be admitted into evidence in a criminal case.  *State v. Vice*, 2021 WI 63, ¶28, 397 Wis. 2d 682, 961 N.W.2d 1.  "The admission of an involuntary statement into evidence is a violation of a criminal defendant's constitutional right to due process."  *Id.*  When a defendant raises a voluntariness challenge, the State must prove by a preponderance of the evidence that the statements made by the defendant were voluntary.  *State v. Jerrell C.J.*, 2005 WI 105, ¶17, 283 Wis. 2d 145, 699 N.W.2d 110.  A defendant's statements are voluntary if those statements "are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist."  *State v. Hoppe*, 2003 WI 43, ¶36, 261 Wis. 2d 294, 661 N.W.2d 407.

¶37     Whether a defendant's statements were voluntary involves the application of constitutional principles to historical facts.  *Id.*, ¶34.  We defer to the circuit court's findings regarding the factual circumstances that surrounded the making of the statements unless those findings are clearly erroneous.  *Vice*, 397 Wis. 2d 682, ¶21.  However, the application of constitutional principles to those facts is a question of law that we review independently.  *Id.*

¶38     The well-established test for voluntariness considers the totality of the circumstances in balancing "the personal characteristics of the defendant against pressures imposed by law enforcement officers to determine if the

20

pressures exceeded the defendant's ability to resist." *State v. Lemoine*, 2013 WI 5, ¶3, 345 Wis. 2d 171, 827 N.W.2d 589.

¶39    "Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness." *Hoppe*, 261 Wis. 2d 294, ¶37 (citing *State v. Clappes*, 136 Wis. 2d 222, 239, 401 N.W.2d 759 (1987); *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.")).  Hence, "some coercive or improper police conduct must exist in order to sustain a finding of involuntariness." *Id.*, ¶46.

¶40    "The balancing of the defendant's personal characteristics against the police pressures reflects a recognition that the amount of police pressure that is constitutional is not the same for each defendant." *Id.*, ¶40.  Our supreme court recognizes that police pressures "that are not coercive in one set of circumstances may be coercive in another set of circumstances if the defendant's condition renders him or her uncommonly susceptible to police pressures." *Jerrell C.J.*, 283 Wis. 2d 145, ¶19 (quoting *Hoppe*, 261 Wis. 2d 294, ¶46).  As explained in more detail below, being a child is a condition that renders a suspect "uncommonly susceptible to police pressures." *Id.*, ¶26.

¶41    Police conduct "need not be egregious or outrageous in order to be coercive." *Id.*, ¶19.  Instead, "coercive or improper police conduct 'may arguably take subtle forms.'" *Vice*, 397 Wis. 2d 682, ¶32 (citation omitted).  Even if none of the police conduct is coercive or improper in isolation, the conduct of police on the whole may be coercive or improper. *Id.*, ¶48 (stating that individual police

techniques may "add up to coercion" when considered in the aggregate); *Hoppe*, 261 Wis. 2d 294, ¶59.

¶42 In determining whether police conduct was coercive or improper, we consider:

> the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*Hoppe*, 261 Wis. 2d 294, ¶39.

¶43 Besides age, other relevant personal characteristics of a defendant that we consider are education and intelligence, prior experience with law enforcement, and physical and emotional condition. *Lemoine*, 345 Wis. 2d 171, ¶18 (citing *Hoppe*, 261 Wis. 2d 294, ¶39). "When the allegedly coercive police conduct includes subtle forms of psychological persuasion, the mental condition of the defendant becomes a more significant factor in the 'voluntariness' calculus." *Hoppe*, 261 Wis. 2d 294, ¶40.

¶44 As our supreme court has recognized, when applying this balancing test to a juvenile, "[t]he [United States] Supreme Court in the past has spoken of the need to exercise 'special caution' when assessing the voluntariness of a juvenile confession." *Jerrell C.J.*, 283 Wis. 2d 145, ¶21 (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (citing *In re Gault*, 387 U.S. 1, 45 (1967); *Gallegos v. Colorado*, 370 U.S. 49, 53-55 (1962); *Haley v. Ohio*, 332 U.S. 596, 599-601 (1948))).

## II. Exclusion of Kruckenberg's Statements Following Pertzborn's "Proper Burial" Comment

### A. Improper or Coercive Police Conduct

¶45 As noted above, in determining whether police conduct was coercive, we must first determine whether the suspect was "uncommonly susceptible to police pressures." *Id.*, ¶19. One way that a suspect may be "uncommonly susceptible to police pressures" is if the suspect is a child. *Id.*, ¶26. "Courts have long recognized the importance of age in determining whether a juvenile confession is voluntary." *Id.*, ¶25. "While not necessarily dispositive, 'youth remains a critical factor for our consideration, and the younger the child the more carefully we will scrutinize police questioning tactics to determine if excessive coercion or intimidation or simple immaturity that would not affect an adult has tainted the juvenile's confession.'" *Id.*, ¶26 (citation omitted).

¶46 The caution with which we are instructed to approach juvenile confessions is with good reason. As the United States Supreme Court has recognized, "children 'generally are less mature and responsible than adults,'" "lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them," and "are more vulnerable or susceptible to … outside pressures." *J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) (citations omitted). As our supreme court has recognized, children are "more likely to want to please and believe police officers because they are authority figures" and "are incapable of fully realizing the consequences of their decisions." *Jerrell C.J.*, 283 Wis. 2d 145, ¶26 n.6. Accordingly, the same police pressure that may not be coercive for an adult suspect may be coercive for a juvenile suspect. *Id.*, ¶26.

¶47 It is true that Kruckenberg was an older juvenile when interrogated by Pertzborn. In itself, this lessens the concern about Kruckenberg's susceptibility to police pressures; age would carry more weight here if Kruckenberg were younger still. But we conclude that, at the point of Pertzborn's "proper burial" comment, the cumulative techniques used by Pertzborn to elicit Kruckenberg's incriminating statements were coercive. We make this determination in the context of Kruckenberg's personal characteristics that made him more susceptible to police pressure, including his age.

¶48 Before we examine the individual interrogation techniques Pertzborn used, we set forth the context in which Pertzborn's interrogation occurred.

¶49 First, when Pertzborn and other law enforcement officers arrived unannounced at E.F.'s residence at around 11:00 p.m. on January 9, Kruckenberg had already been in law enforcement presence for seven hours that day, being questioned by officers the majority of the time. Pertzborn and Baker left E.F.'s residence with Kruckenberg at around 11:30 p.m. and arrived at the Brodhead PD a few minutes after midnight on January 10. Pertzborn waited to ask Kruckenberg more questions about A.B. until E.F. arrived at 12:40 a.m. Pertzborn made his "proper burial" comment to Kruckenberg just after 1:00 a.m. At 1:45 a.m., Kruckenberg was taken by Pertzborn and Baker in Pertzborn's unmarked vehicle to the Albany woods to find A.B. After A.B. was located, Pertzborn indicated that he wanted to ask Kruckenberg more questions and, at approximately 2:30 a.m., took him by unmarked police vehicle to the Albany PD, which was a few minutes away. At 4:10 a.m., Kruckenberg was arrested by another officer.

¶50 By the time he was arrested, Kruckenberg had been in continuous law enforcement presence for over five hours. All told, Kruckenberg had been in

the presence of law enforcement officers for thirteen of the twenty-six hours prior to his arrest, with Kruckenberg being questioned by law enforcement officers the majority of that time. As recognized by our supreme court in *Jerrell C.J.*, we must carefully scrutinize "prolonged or repeated questioning" when examining the voluntariness of a juvenile's statement to law enforcement. *Id.*, ¶21. Therefore, we conclude that these repeated, lengthy interviews, conducted in the early morning hours and late at night, are evidence of coercive police conduct. *See id.*, ¶33 (lengthy custody and interrogation of a juvenile are evidence of coercive conduct).

¶51 Another indication of police coercion is that Kruckenberg was never given *Miranda* warnings during the January 10 interactions with law enforcement.[7] Even when these warnings are not required, the failure to give *Miranda* warnings is relevant to our coercion inquiry. *Lemoine*, 345 Wis. 2d 171, ¶33 ("The lack of these warnings, even when not required by the relevant case law, is a relevant piece of the [voluntariness] equation."). When given, these warnings show that the defendant was informed of the defendant's right to counsel and the defendant's right to not speak with law enforcement and that the police were aware of the defendant's rights and were prepared to honor those rights. 2 WAYNE R. LAFAVE et al., *Criminal Procedure* § 6.2(c) (4th ed. 2023). The failure to give the *Miranda* warnings is especially significant when, as here, the police were questioning a juvenile. *See J.D.B.*, 564 U.S. at 272 (2011) (children

---

[7] Under *Miranda*, 384 U.S. at 444, a defendant's statements made during a custodial interrogation are not admissible in evidence unless the defendant has been warned that they have a right to remain silent, that any statement they make may be used as evidence against them, and that they have a right to the presence of an attorney, either retained or appointed.

generally lack the "experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them" (citation omitted)).

¶52 We now turn to the specific interrogation techniques that Pertzborn used to attempt to elicit incriminating statements from Kruckenberg.

¶53 One particularly significant technique was the heavy psychological pressure that Pertzborn exerted on Kruckenberg in attempting to cause him to incriminate himself, which included confrontational and accusatory interrogation techniques. For example, Pertzborn did all of the following: repeatedly said that he did not believe Kruckenberg's denials of guilt; pointed out what Pertzborn asserted were contradictions in Kruckenberg's version of events; repeatedly interrupted Kruckenberg to accuse him of lying; and used a moral appeal to Kruckenberg that "we need to … give that precious child of yours a proper burial," even though Kruckenberg had consistently insisted up to that point that he did not know what happened to A.B. after he gave A.B. to "Tyler." These psychological techniques are similar to those police used against the 14-year-old defendant in *Jerrell C.J.* that contributed to our supreme court's determination that the defendant's confession was involuntary. *Jerrell C.J.*, 283 Wis. 2d 145, ¶¶34-35 ("psychological techniques," such as refusing a suspect's denials of guilt and urging a suspect to tell a "different 'truth,'" may be coercive when applied to a juvenile).

¶54 Additional psychological techniques that Pertzborn used, as the circuit court found, included: making emotional and moral appeals to Kruckenberg, such as assuring Kruckenberg that "[n]othing that has happened here is too far from redeeming you"; asking Kruckenberg if he is the type of person who has a soul and feels bad about making a mistake or if he is an "evil"

26

person who "[doesn't] give a shit"; and urging Kruckenberg to tell the truth so that they could "recover that body" and "give that precious child … a proper burial." In *Hoppe*, our supreme court determined that these types of psychological techniques, when employed against a defendant who is uncommonly susceptible to police pressure, contributed to the State's failure to prove that, under the totality of the circumstances, the defendant's statements were voluntary. *Hoppe*, 261 Wis. 2d 294, ¶¶55-58 (Law enforcement's increased use of psychological pressure by raising emotional topics such as the death of Hoppe's parents, the concerns of the family of the deceased, and Hoppe's prior military service in Vietnam, when combined with Hoppe's diminished psychological and physical state, contributed to the State's failure to prove that his statements were voluntary.).

¶55    Although E.F.'s conduct as a non-state actor in itself cannot constitute coercive or improper police conduct, *see Connelly*, 479 U.S. at 164 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."), Pertzborn was able to leverage E.F.'s close, quasi-maternal relationship with Kruckenberg to put further pressure on Kruckenberg to attempt to get him to make incriminating statements. For example, Pertzborn used E.F.'s repeated urgings for Kruckenberg to "tell the truth" to further accuse Kruckenberg of lying. And when Kruckenberg described "Tyler," the alleged friend to whom Kruckenberg gave A.B., Pertzborn engaged E.F. directly to refute this aspect of Kruckenberg's version of events, asking her: "You ever heard of this kid? You ever seen this kid?" Several minutes later, Pertzborn again used E.F.'s presence to support his accusations that Kruckenberg was lying:

[Kruckenberg]: I'm telling … the truth.

> S/A Pertzborn: No you are not. You're not! [(Pertzborn turns to E.F.)] You know him a lot better than I do and I know I am looking at your eyes and you're going[,] oh hell no.
>
> [E.F.]: You gotta tell the truth buddy. Please … please tell the truth.
>
> S/A Pertzborn: You need … that's … I'm so glad she's here.

¶56 Another technique that Pertzborn repeatedly employed was his misleading claim that he was there as an advocate for Kruckenberg and for the purpose of helping Kruckenberg, rather than as an agent for the state. For instance, Pertzborn told Kruckenberg that he was in a position to help, that he was "putting [his] neck way out there" for Kruckenberg, and that "there are people that are going to step up and help you, but … we can't do that until you start realizing what's going on." The circuit court also found that Pertzborn made implied promises of leniency, which is particularly relevant when considering Kruckenberg's age and, as will be addressed below, his inexperience with the criminal justice system. For example, Pertzborn emphasized that he could help Kruckenberg by writing in his report that Kruckenberg was cooperative and apologetic, an action that would "weigh … a whole lot on where this all can go."

¶57 In a potentially powerful misrepresentation, Pertzborn also conflated his offers to "help" Kruckenberg with E.F.'s offers of help, a person with whom Kruckenberg had a parent-like relationship:[8]

> [E.F.]: Honey[,] I can't help you if you can't tell the truth.

---

[8] The circuit court found that Kruckenberg considered E.F. to "be like a mother to him." This finding is supported by Kruckenberg's statements during the second Albany PD interview, in which he said that E.F. "might as well be" his mother and "cares about me more than my actual mother."

28

[Kruckenberg]: I'm telling the truth.

S/A Pertzborn: Nothing.

[E.F.]: I will do anything in my power to help you if you tell the truth[,] honey.

S/A Pertzborn: Nothing that has happened here is too far from redeeming you. I can help you still, and I am willing to.

[E.F.]: I am too.

….

S/A Pertzborn: There are people that are going to step up and help you, but we're not, we can't do that until you start realizing what's going on.

….

[E.F.]: We can't help you if you won't tell us okay? But we will do everything in our power to help you.

S/A Pertzborn: Everything in our power to help you.

[E.F.]: I promise[,] Logan.

S/A Pertzborn: That's why I'm here is to help you.

¶58 In these statements, Pertzborn purported to adopt the same parental-like concern for Kruckenberg that was displayed by a highly significant parental figure to Kruckenberg. E.F. said "*we* will do everything in *our* power to help you," which Pertzborn immediately echoed by reiterating "[e]verything in *our* power to help you." (Emphasis added.) This had the effect of misrepresenting that Pertzborn's purpose in being present was to help Kruckenberg rather than to interrogate him as an agent of the state.

¶59 This is not to say that an interviewer's expressions of sympathy, support, or plans to advocate for a defendant in the future are necessarily coercive in all cases. As we have noted, the legal standard is highly case specific. Here,

29

however, in part by working off the presence of the quasi-maternal E.F., Pertzborn took an extreme route and suggested that his role in the interrogation was to join with E.F. in protecting Kruckenberg.

¶60 Pertzborn's promises of helping Kruckenberg were accented by Pertzborn's physicality, implying a parental familiarity. While Pertzborn was interrogating Kruckenberg, he repeatedly leaned over the table towards Kruckenberg, gesturing with his hands in close proximity to Kruckenberg and, in several instances, touching or taking hold of Kruckenberg's hands. After E.F. and Baker left the interrogation room and immediately before Pertzborn's "proper burial" comment, Pertzborn took and held Kruckenberg's hand, saying, "I know you're scared. I know and I'm going to help you." The circuit court noted that it had never before reviewed such an action by law enforcement, deemed it "very unusual," and found that it was an "intimidation factor" akin to a parent taking control over a child. Pertzborn then made a moral plea to Kruckenberg to tell the truth so that they could recover A.B.'s body for a "proper burial."[9]

¶61 This was the culmination of Pertzborn's high-pressure interrogation techniques under the particular circumstances here. It happened to have the intended effect. Kruckenberg responded with highly incriminating statements.

---

[9] The State argues that the circuit court's finding regarding Pertzborn's hand-holding gesture was clearly erroneous. According to the State's interpretation of the video, Pertzborn was merely offering his help to Kruckenberg in a "gesture of trust and support," and a reasonable person in Kruckenberg's position at the time would not have perceived this gesture as intimidating or controlling. This argument fails because the court's finding is not contrary to the great weight and clear preponderance of the evidence in the record, including our review of the video. *See Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784.

¶62    When considered as a whole—and especially when used on a juvenile—these pressures applied up to the point of Pertzborn's "proper burial" comment are strong evidence of police coercion. *See **Jerrell C.J.***, 283 Wis. 2d 145, ¶35.

¶63    The State argues that there was no coercive or improper police conduct because each of the techniques that Pertzborn used here has been deemed not coercive as a matter of law. But the State's analysis misses the mark. As explained above, police conduct can be improper or coercive in the context of a particular case even if none of the individual techniques are coercive in isolation, especially when the suspect is uncommonly susceptible to police pressures. ***Hoppe***, 261 Wis. 2d 294, ¶59. Instead, we may consider police conduct "in the aggregate" to determine whether that conduct was coercive or improper within the context of a particular case. ***Vice***, 397 Wis. 2d 682, ¶48. Assuming without deciding that each technique, described at a generic level, could be deemed not coercive if employed under different circumstances, we conclude that the numerous techniques used to attempt to elicit incriminating statements—in light of Kruckenberg's age—were coercive when considered together. Therefore, we conclude that Pertzborn used coercive pressures in eliciting Kruckenberg's statements, culminating in Pertzborn's "proper burial" comment.

¶64    The State also argues that it was "clear error" for the circuit court to find police coercion because it based its finding on Kruckenberg's state of mind, E.F.'s conduct, and Cutler's psychological definition of coercion. We disagree with the State's characterization of the court's decision. But, even if the State is correct that the court considered improper factors in its determination of coercion, that would not change our analysis because we independently determine whether the police conduct was improper or coercive. ***Clappes***, 136 Wis. 2d at 235.

31

¶65  We now weigh these coercive pressures used by law enforcement against Kruckenberg's personal characteristics in determining, under the totality of the circumstances, whether the State has met its burden in proving that Kruckenberg's statements were voluntary.  *See Lemoine*, 345 Wis. 2d 171, ¶18; *Hoppe*, 261 Wis. 2d 294, ¶36.

## B.  Kruckenberg's Personal Characteristics

¶66  As discussed, one of the most important characteristics for the voluntariness determination is that Kruckenberg was 16 years old.  Although juveniles nearing the age of majority are generally considered to be less susceptible to police pressure than younger children, *J.D.B.*, 564 U.S. at 277, the fact remains that Kruckenberg was not an adult, *see id.* at 272-73 ("'[N]o matter how sophisticated,' a juvenile subject of police interrogation 'cannot be compared' to an adult subject." (citation omitted)); *Jerrell C.J.*, 283 Wis. 2d 145, ¶26 ("Simply put, children are different than adults.").  Kruckenberg's status as a minor rendered him more vulnerable to law enforcement pressures and showed that he lacked the "experience, perspective, and judgment" to avoid detrimental choices.  *J.D.B.*, 564 U.S. at 272.  In sum, Kruckenberg's age weighs against voluntariness.

¶67  Another factor was Kruckenberg's minimal prior experience with law enforcement, which weighs against voluntariness.  *See Jerrell C.J.*, 283 Wis. 2d 145, ¶¶28-29 (juvenile defendant's limited experience with law enforcement weighed against voluntariness); *Brown v. State*, 64 Wis. 2d 581, 588, 219 N.W.2d 373 (1974) ("[I]f a defendant had had some prior experience with police, his power of resistance to police pressure might be assumed to be greater than the defendant who is inexperienced in the ways of crime or its detection.").  Here, our

review of the record does not reveal that Kruckenberg had a prior criminal record or any significant prior police interaction regarding criminal conduct.[10]

¶68 Kruckenberg's physical, mental, and emotional condition also rendered him particularly susceptible to law enforcement pressure. As the circuit court found, the "rather extraordinary" number of interviews conducted in a short period of time—often unscheduled or unannounced and late at night or in the early morning hours—contributed to Kruckenberg's physical, mental, and emotional fatigue. During the first interview at the Albany PD (which began at around 2:00 p.m.), Kruckenberg told officers that, besides some water law enforcement had given him during that interview, he had not slept, eaten, or drunk anything in the previous three days. Throughout this interview, Kruckenberg complained of stomach pains and said on multiple occasions that he had almost vomited and could not keep liquid or solids down. Eventually, Kruckenberg asked to go home, saying that he could not wait to sleep and eat. E.F. later testified that she did not recall Kruckenberg eating or sleeping when he was at her house between police interviews.[11] Kruckenberg also told Pertzborn that he was tired before the Brodhead PD interrogation began. While waiting for E.F. to arrive at the

---

[10] Our search of the record reveals only the following evidence of Kruckenberg's prior experience with law enforcement: Kruckenberg told officers that he had visited the Albany PD on one occasion for "truancy" and that he went to "the police office every other day" when he had previously lived in Lodi, Wisconsin. We are unclear as to whether this latter statement was related to law enforcement presence at Kruckenberg's school. Nonetheless, there is no evidence Kruckenberg had any prior criminal charges or record reflecting law enforcement contact.

[11] The parties also stipulated that E.F.'s son (who was not available to testify during the suppression hearings) would have testified that the son was talking and playing video games with Kruckenberg between 7:00 p.m. and 11:00 p.m. on January 9, before law enforcement arrived and took Kruckenberg to the Brodhead PD.

Brodhead PD, Pertzborn remarked "this is fucking taking forever. I need sleep." Kruckenberg responded "me too."

¶69    Kruckenberg also displayed signs of being emotionally upset during both the first Albany PD and Brodhead PD interviews. This included visibly crying. Pertzborn testified that he saw Kruckenberg's eyes "well up" following Pertzborn's "proper burial" comment. The foregoing evidence of Kruckenberg's weakened physical and emotional condition, as referenced by the circuit court, weighs against voluntariness. *See Hoppe*, 261 Wis. 2d 294, ¶39.

¶70    Another significant factor when considering the totality of the circumstances is whether Kruckenberg had the advice or support of a parent or trusted adult. Our supreme court has recognized that the presence of a "lawyer or an adult relative or friend" is significant to the determination of voluntariness in the questioning of a juvenile suspect because their presence may protect the juvenile suspect from the coercive tactics of the police and allows the adult to offer advice that puts the suspect "on a less unequal footing with his interrogators." *State v. Verhasselt*, 83 Wis. 2d 647, 657, 266 N.W.2d 342 (1978) (quoting *Gallegos*, 370 U.S. at 54); *Jerrell C.J.*, 283 Wis. 2d 145, ¶31 ("[P]arents are often the very people children turn to for advice."). The presence of a parent, lawyer, or other trusted adult is not required for police questioning of children, but is instead a factor to be considered in the totality of the circumstances. *Jerrell C.J.*, 283 Wis. 2d 145, ¶43.

¶71    Although the presence of a parent or other trusted adult generally weighs in favor of voluntariness, this is not always the case. As other jurisdictions have recognized, "the mere presence of a parent is insufficient to protect a juvenile's rights, because presence alone cannot be said to provide the buffer

between police and the juvenile ….  In order to serve as a buffer, the parent must be acting with the interests of the juvenile in mind." ***State in Interest of A.S.***, 999 A.2d 1136, 1146 (N.J. 2010).  For instance, in ***State in Interest of M.P.***, 299 A.3d 133, 166-67 (N.J. Super. Ct. App. Div. 2023), the New Jersey appellate court held that the mother of the juvenile suspect "was not merely an advisor and did not serve as a 'buffer' during the interrogation process" because she encouraged the suspect to be truthful.  Similarly, in ***In re J.G.***, 2023-Ohio-4042, 228 N.E.3d 645, 656-57 (Ct. App. 1st Dist. 2023), the Ohio Court of Appeals held that the conduct of the juvenile suspect's mother "militate[d] against a finding of voluntariness" because she "was not there to advise or help J.G. understand his rights, but rather to encourage him to be truthful and cooperate with the police."  And in ***State v. G.O.***, 543 P.3d 1096, 1117 (Kan. 2024), the Kansas Supreme Court held that the presence of the juvenile suspect's mother weighed against voluntariness because "[s]he became a proxy for the detective, confirming his representation that G.O. was not under arrest and that G.O. needed to speak freely and offer details of what had happened."

¶72     Here, E.F. did not act as a buffer to provide some balance to the unequal positions of Pertzborn and Kruckenberg.  The record reflects that the only advice Kruckenberg received from any adult was E.F.'s advice that he talk to Pertzborn and her repeated urgings to Kruckenberg to tell "the truth," including at times when Pertzborn was insisting that he was lying.  At one point, E.F. directly asked, "Logan what did you guys do with the baby after [the baby] was born?"  She also assured Kruckenberg that she could help him if he told "the truth," even going so far as to insinuate that she and Pertzborn would, acting together, help Kruckenberg if he told "the truth":  "*We* can't help you if you won't tell us okay?  But *we* will do everything in *our* power to help you."  (Emphasis added.)  Instead

of providing Kruckenberg with a more equal footing to Pertzborn, E.F.'s presence intensified Pertzborn's pressures on Kruckenberg to incriminate himself. Cutler's opinion appears well supported that E.F. "amplified the pressures of the interrogation and urged [Kruckenberg] to acquiesce to the investigators' demands." For these reasons, E.F.'s presence and conduct weigh against voluntariness.

¶73 We also consider Kruckenberg's education and intelligence. The circuit court found that Kruckenberg was not receiving any medication or treatment for mental illness and did not have any "special education needs" or modified school schedule reflecting an "intellectual disability." The court attributed Kruckenberg's failing grades in school "to a lack of effort in often failing to attend school," rather than a lack of "an innate ability to do the work" or "ordinary or average intelligence." These findings are not clearly erroneous; there is an evidentiary basis to find that Kruckenberg was not necessarily of below average intelligence, despite his poor performance in school. This weighs in favor of voluntariness.

¶74 Another personal characteristic, which the State argues supports its position that Kruckenberg's statements were voluntary during Pertzborn's interrogation, was that Kruckenberg continued to lie to Pertzborn about certain details in his version of events. The State asserts that, when Pertzborn said that the police knew Kruckenberg had not given A.B. to "Tyler," Kruckenberg changed his account and admitted to leaving A.B. in the woods, but insisted that he buried A.B. in the snow (as opposed to killing A.B. in a more direct manner) and that his friend "Alex" had been involved. According to the State, Kruckenberg's ability to lie "shows that he was perfectly capable of overcoming any improper coercive pressure placed on him." We are not persuaded.

¶75     The State's argument is flawed in two respects.  First, the State's argument rests on the false premise that Kruckenberg strategically admitted to leaving A.B. in the Albany woods only after Pertzborn told Kruckenberg that nobody in Brodhead matched Kruckenberg's description of "Tyler."  However, the record shows that Kruckenberg continued to insist that his version of events was true (*i.e.*, that he gave A.B. to "Tyler" and did not know where "Tyler" took A.B.) even after Pertzborn told him that nobody in Brodhead matched "Tyler's" description.  Kruckenberg did not change his version of events because of Pertzborn's comment about "Tyler."  Rather, Kruckenberg changed his version of events because the combined pressures of the interrogation culminating in Pertzborn's "proper burial" comment (as summarized above) overcame Kruckenberg's will to resist such that he admitted to leaving A.B. in the woods to die.

¶76     Second, the State's argument errs in suggesting that a defendant's ability to lie during a police interrogation conclusively shows that the defendant's statements were voluntary.  To be sure, a defendant's ability to modify the defendant's version of events during police questioning is a relevant factor in the voluntariness inquiry.  *See State v. Moore*, 2015 WI 54, ¶¶60-61, 363 Wis. 2d 376, 864 N.W.2d 827 (considering the juvenile suspect's "ability to concoct and modify a story 'on the fly'" in the voluntariness inquiry because it "suggests a level of sophistication and adaptability").  But this fact is not conclusive in the voluntariness inquiry and must be considered within the totality of the circumstances.  Here, the combined pressures of the interrogation, as summarized above, caused Kruckenberg to abandon the version of events to which he had adhered through multiple rounds of police questioning and admit to leaving A.B. in the woods to die.  Although the fact that Kruckenberg's subsequent modified

version of events still contained some fabricated details is a factor that weighs slightly in favor of voluntariness, this fact on its own does not establish that Kruckenberg's statements after Pertzborn's "proper burial" comment were voluntary when viewed within the totality of the circumstances.

¶77 Based on the foregoing factors, the greater weight of the evidence shows that, under the totality of the circumstances, Pertzborn's interrogation techniques, when balanced with Kruckenberg's personal characteristics, overcame Kruckenberg's ability to resist pressures brought to bear on him in an unequal confrontation. *See* **Hoppe**, 261 Wis. 2d 294, ¶36. Therefore, the State has not met its burden of proving that Kruckenberg's statements after Pertzborn's "proper burial" comment, were "the product of a free and unconstrained will, reflecting deliberateness of choice." **Id.**

¶78 Additionally, we affirm the court's exclusion of all of Kruckenberg's subsequent statements, beginning with his responses to Pertzborn's "proper burial" comment, until his arrest. When a defendant has given an involuntary statement, "a subsequent statement is also considered involuntary unless it can be 'separated from the circumstances surrounding' the earlier statement by a 'break in the stream of events,' between the first statement to the second, 'sufficient to insulate the statement from the effect of all that went before.'" **State v. Mark**, 2008 WI App 44, ¶20, 308 Wis. 2d 191, 747 N.W.2d 727 (quoting **Clewis v. Texas**, 386 U.S. 707, 710 (1967)). In making this determination, we may consider the following factors: "the change in place of the interrogations, the time that passed between the statements, … the change in the identity of the interrogators," and "the extent to which the coercion employed in obtaining the initial confession was severe enough to be likely to affect the defendant's subsequent statements." **Id.**, ¶22. There is a strong presumption that subsequent statements are a continuation

of an involuntary statement. *State v. Schlise*, 86 Wis. 2d 26, 47, 271 N.W.2d 619 (1978) (citing *Lang v. State*, 178 Wis. 114, 126, 189 N.W. 558 (1922)).

¶79    Here, no such separation occurred during the remainder of the Brodhead PD interrogation, and the State does not argue to the contrary. There was also not sufficient separation between Kruckenberg's involuntary statements at the Brodhead PD and his statements at the Albany woods and in the second Albany PD interrogation. These subsequent interactions cannot be separated from the circumstances surrounding Kruckenberg's earlier involuntary statements during the Brodhead PD interrogation because they took place immediately after Kruckenberg's involuntary statements at the Brodhead PD, involved continued interrogation by Pertzborn, and did not provide a sufficient break in the stream of events so as to alleviate the coercive pressures that rendered Kruckenberg's Brodhead statements involuntary. The record supports the circuit court's determination that the Brodhead PD interrogation, the Albany woods interrogation, and the second Albany PD interrogation were part of "a continuous interview that never ended" until Kruckenberg's arrest, and the State fails to develop any argument that these interviews were not continuous.[12] Accordingly, we conclude that the circuit court properly excluded as involuntary Kruckenberg's subsequent statements during the Albany woods interrogation and the second

---

[12] The State disputes the circuit court's finding that the Brodhead PD interrogation, the Albany woods visit, and the second Albany PD interrogation were a "continuous interview that never ended," asserting that, "given the long break in questioning between the Brodhead interview and the Albany interview, the State believes these [interviews] should be treated as discrete events." But the State fails to develop an evidence-based or legal argument supporting this assertion. Therefore, we decline to overturn the court's factual finding because the State fails to show that it is clearly erroneous. *See Metropolitan Assocs.* 379 Wis. 2d 141, ¶62 ("We will upset a finding of fact only if it is clearly erroneous.").

Albany PD interrogation, including while traveling to and from those locations, up until Kruckenberg's arrest.

¶80    For the foregoing reasons, we affirm the circuit court's exclusion of Kruckenberg's statements following Pertzborn's "proper burial" comment during the Brodhead PD interrogation and all of his subsequent statements until his arrest.

### III.  Exclusion of Kruckenberg's Statements Before Pertzborn's "Proper Burial" Comment

¶81    Having concluded that Kruckenberg's statements following Pertzborn's "proper burial" comment and up until his arrest were involuntary and must be excluded as evidence, we now consider whether the circuit court properly excluded Kruckenberg's statements during the Brodhead PD interrogation prior to Pertzborn's "proper burial" comment.

¶82    The circuit court's order states in relevant part:  "Statements made to DCI Special Agent Pertzborn at the Brodhead Police Department, at the [Albany woods], and at the Albany Police Department, on January 10, 2021:   the defendant's Motion to Suppress Evidence Illegally Obtained in Police Interrogations is GRANTED.   The Court finds these statements were both custodial and involuntary."  To the extent that the court excluded as involuntary and as the product of an unwarned custodial interrogation Kruckenberg's statements at the Brodhead PD prior to Pertzborn's "proper burial" comment, we reverse.

¶83    First, Kruckenberg does not argue on appeal that statements he made to Pertzborn during the Brodhead PD interrogation prior to Pertzborn's "proper

burial" comment were involuntary. Instead, Kruckenberg's argument focuses solely on the involuntariness of his statements that followed Pertzborn's comment:

> Pertzborn told [Kruckenberg] that they needed to "give that precious child of yours, a proper burial." According to Pertzborn, he saw [Kruckenberg's] "eyes well up" during this exchange. It is only after this, that [Kruckenberg] began making incriminating statements. Pertzborn broke [Kruckenberg] down and cornered him into a position where confession was the only option.
>
> [Kruckenberg] did not choose to make incriminating statements with free and unconstrained will reflecting deliberateness of choice…. These statements, and the continuing statements in Albany, were unconstitutionally obtained, and must be suppressed.

(Record citations omitted.) We interpret this passage from Kruckenberg's appellate brief to mean that, here, Kruckenberg argues only that his statements that followed Pertzborn's "proper burial" comment were involuntary. Indeed, Kruckenberg's appellate brief contains no argument that his statements prior to Pertzborn's "proper burial" comment were involuntary. "An issue raised in the trial court, but not raised on appeal, is deemed abandoned." *A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998). Therefore, we conclude that Kruckenberg has abandoned an argument that his statements prior to Pertzborn's "proper burial" comment were involuntary, and we do not consider it further.

¶84 Second, we now explain why we conclude that the State has established by a preponderance of evidence that Kruckenberg was not in custody for the purposes of *Miranda* during the Brodhead PD interrogation prior to

41

Pertzborn's "proper burial" comment.[13]  *See **Dickerson v. United States***, 530 U.S. 428, 433-35 (2000) (holding that both voluntariness and compliance with ***Miranda*** are required to admit a defendant's statements into evidence).

¶85     Under ***Miranda***, a defendant's statements made during a "custodial interrogation" must be excluded as evidence unless the defendant has been warned that the defendant has a right to remain silent, that any statement the defendant makes may be used as evidence against the defendant, and that the defendant has a right to the presence of an attorney, either retained or appointed.  ***State v. Dobbs***, 2020 WI 64, ¶52, 392 Wis. 2d 505, 945 N.W.2d 609.  As previously referenced, the State does not dispute that Kruckenberg was "interrogated" for the purposes of ***Miranda*** at the Brodhead PD, at the Albany woods, and at the Albany PD.  This leaves the State with the burden of establishing by a preponderance of the evidence that Kruckenberg was not in custody during the Brodhead PD interrogation prior to Pertzborn's "proper burial" comment and, therefore, that he was not entitled to ***Miranda*** warnings.  ***State v. Armstrong***, 223 Wis. 2d 331, 345, 588 N.W.2d 606 (1999), *overruled on other grounds by **State v. Halverson***, 2021 WI 7, ¶¶21, 28, 395 Wis. 2d 385, 953 N.W.2d 847.

¶86     Wisconsin courts apply a two-step test for determining whether a defendant was in custody under ***Miranda***.  First, we must "ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and

---

[13] Because our conclusion with respect to voluntariness is dispositive, we do not address whether Kruckenberg was subject to custodial interrogation for the purpose of ***Miranda*** after Pertzborn's "proper burial" comment.  *See **Barrows v. American Fam. Ins. Co.***, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

leave.'" ***Halverson***, 395 Wis. 2d 385, ¶17 (quoting ***Howes v. Fields***, 565 U.S. 499, 509 (2012)). The determination of whether a reasonable person in Kruckenberg's position would have felt free to terminate the questioning and leave must be viewed from the perspective of a reasonable 16-year-old. *See* ***J.D.B.***, 564 U.S. at 277 (the age of a juvenile suspect may be considered in the ***Miranda*** custody analysis). Second, we must determine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in ***Miranda***." ***Halverson***, 395 Wis. 2d 385, ¶17 (quoting ***Fields***, 565 U.S. at 509).

¶87 Here, Pertzborn repeatedly and unambiguously told Kruckenberg that he was not under arrest, did not have to answer questions, and was free to leave. *See* ***State v. Quigley***, 2016 WI App 53, ¶40, 370 Wis. 2d 702, 883 N.W.2d 139 (advising a defendant that they are not under arrest and free to leave is "highly probative," "of substantial importance," and "one of the most important" factors to consider in the custody determination (citations omitted)). Pertzborn gave Kruckenberg these unambiguous advisements at E.F.'s house before leaving for the Brodhead PD and again at the Brodhead PD after E.F. arrived and before interrogating Kruckenberg. Each time, Kruckenberg said that he understood the advisements, he did not object to accompanying Pertzborn to the Brodhead PD for more questioning, and he did not object to the questioning once at the Brodhead PD. *See* ***id.***, ¶41 (a defendant's acknowledgement and lack of objection are "highly significant" to the custody determination (citation omitted)). In sum, Pertzborn's repeated advisements that Kruckenberg was not under arrest, did not have to answer questions, and was free to leave, combined with Kruckenberg's affirmations that he understood these advisements, weigh strongly against custody.

¶88 Also weighing against custody is the fact that Kruckenberg was never frisked, handcuffed, or physically restrained before or during the Brodhead PD interrogation. *See Dobbs*, 392 Wis. 2d 505, ¶¶64-65 (the "degree of restraint" is a factor in the custody determination). Although Kruckenberg was driven to the Brodhead PD in Pertzborn's unmarked vehicle, Kruckenberg was seated unrestrained in the front passenger seat of the unlocked vehicle and was not guided into or out of the vehicle. *See State v. Mosher*, 221 Wis. 2d 203, 212, 584 N.W.2d 553 (Ct. App. 1998) (fact that suspect was transported to the police station in an unlocked police car and got out of the car unassisted weighed against custody). And while the interrogation took place in a windowless interview room of a police station, the doors to the room were unlocked, and the officers never drew or gestured to their weapons.

¶89 Another factor weighing against custody was E.F.'s presence during the questioning at the Brodhead PD. As noted, Kruckenberg asked that Pertzborn wait to begin questioning him about A.B. until E.F. arrived, which Pertzborn honored. Although, as we have discussed above, E.F. did not act as a "buffer" between Pertzborn and Kruckenberg for the purposes of our involuntariness determination, she was nevertheless present and available to drive Kruckenberg home if he had asked to leave prior to Pertzborn's "proper burial" comment. For these reasons, E.F.'s presence during the Brodhead PD interrogation provides further support that a reasonable 16-year-old in Kruckenberg's position would have felt free to terminate the questioning and leave. *Cf. Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) (police officers refusing to allow a juvenile defendant's parents in the interrogation room weighed towards custody).

¶90 Kruckenberg argues that all of the following contribute to the conclusion that he was in custody: After the first Albany PD interview on the

afternoon of January 9, E.F. told Kruckenberg that he should not leave her property; the Brodhead PD interrogation took place at a police station ten to fifteen minutes away from E.F.'s residence by car in a police-dominated atmosphere; his cell phones had been previously taken away; he had been interrogated by police on multiple occasions before the Brodhead PD interrogation; he traveled with law enforcement to the Brodhead PD; he was escorted by an officer to the bathroom at the Brodhead PD; and Pertzborn and Baker were wearing bulletproof vests and carrying firearms. According to Kruckenberg, all of these facts would have caused a reasonable 16-year-old to believe that Pertzborn's advisements—*i.e.*, that he was not under arrest, did not have to answer questions, and was free to leave—were "illusory," especially given the sometimes confrontational and accusatory nature of Pertzborn's questioning. *See **State v. Uhlenberg***, 2013 WI App 59, ¶11, 348 Wis. 2d 44, 831 N.W.2d 799 (police conduct effectively nullified an advisement that the suspect was not under arrest).

¶91 This may present a close issue. But we are not persuaded that, prior to Pertzborn's "proper burial" comment, Pertzborn's conduct or the nature of the Brodhead PD interrogation would have caused a reasonable 16-year-old to believe that Pertzborn's advisements were illusory or nullified, given the frequency of Pertzborn's advisements, Kruckenberg's statement that he understood those advisements, the lack of physical restraints on Kruckenberg, and the presence of E.F. during the pertinent portion of the interrogation. For these reasons, we conclude that the State has satisfied its burden of showing by a preponderance of the evidence that a reasonable 16-year-old in Kruckenberg's position would have felt free to leave the Brodhead PD before Pertzborn made the "proper burial" comment.

¶92   Accordingly, we reverse the circuit court's exclusion of Kruckenberg's statements to Pertzborn at the Brodhead PD prior to Pertzborn's "proper burial" comment, based on our conclusion that Kruckenberg abandoned any argument that these statements were involuntary and that the State has met its burden in demonstrating that Kruckenberg was not in custody.

## CONCLUSION

¶93   For the foregoing reasons, we affirm the circuit court's exclusion of all statements made by Kruckenberg after Pertzborn's "proper burial" comment during the Brodhead PD interrogation, during the entire Albany woods interrogation, and during the entire second Albany PD interrogation on January 10 until Kruckenberg's arrest.  However, we reverse the circuit court's exclusion of Kruckenberg's statements to Pertzborn during the Brodhead PD interrogation prior to Pertzborn's "proper burial" comment.

*By the Court.—*Order affirmed in part; reversed in part and cause remanded.

Recommended for publication in the official reports.